DETREX CHEMICAL INDUSTRIES, INC., Plaintiff,

v.

EMPLOYERS INSURANCE OF WAU-SAU, A Mutual Company, Defendant/Third Party Plaintiff,

v.

HARTFORD ACCIDENT & INDEMNITY CO., INTERNATIONAL INSURANCE COMPANY, Third Party Defendants.

No. C85–2278Y.

United States District Court, N.D. Ohio, E.D.

Aug. 27, 1987.

As Corrected Sept. 1, 1987.

On Motion for Partial Reconsideration Feb. 8, 1988.

James P. Conroy and Ralph Streza, Porter, Wright Morris & Arthur, Cleveland, Ohio, Jerold Oshinsky, Robert H. Shulman, Anderson, Baker, Kill & Olick, and Lorelie S. Masters, Washington, D.C., for plaintiff.

Curtis L. Isler, Arter & Hadden, Cleveland, Ohio, for Employers Ins. of Wausau.

Paul L. Gingras, Thomas L. Hamlin, Robins, Zelle, Larson & Kaplan, and Janet Pollish–Forsberg, Minneapolis, Minn., Thomas Schick, McNeal, Schick, Archibald & Biro, Cleveland, Ohio, for Hartford.

Thomas A. Dugan, Ulmer, Berene, Laronge, Glickman & Curtis, Cleveland, Ohio, for International.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, Senior District Judge.

Plaintiff Detrex Corporation (Detrex), formerly known as Detrex Chemical Industries, Inc., brings its action for a declaratory judgment against Employers Insurance of Wausau (Wausau). In its complaint Detrex states that over several years it has purchased from Wausau liability insurance policies.[1] In its first amended complaint, Detrex asserts that it has given Wausau, and its other primary insurance companies,

> [n]otice of environmental proceedings against the plaintiff involving property that is located in Ohio and throughout the country and [asserts that it] is covered by the liability insurance policies sold by Wausau that are the subject of this action.

Noting that the proceedings have been described "with particularity in the notices sent to Wausau," Detrex identifies the "proceedings."

a. *Fields Brook, and surrounding property, Ashtabula, Ohio* —On March 17, 1982, the United States Environmental Protection Agency ("EPA") notified Detrex of its identification as a "potentially responsible party" ("PRP) regarding Fields Brook, and surrounding property. Detrex received a second such letter on May 16, 1986. In these letters, the EPA demanded that Detrex perform certain work to eliminate discharges of substances. These letters may serve to impose statutory liability upon Detrex under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). Detrex notified Wausau of such proceeding on May 31, 1985.

b. *National MicroDynamics Company (Lutex) site, 6153 Airways Boulevard, Chattanooga, Tennessee* —On January 23, 1986, the Tennessee Department of Health and Environment demanded that Detrex show cause why it should not be named as a "liable party" with regard to this site under the Tennessee Hazardous Waste Management Act. Detrex notified Wausau of such proceeding on February 11, 1986.

c. *Equipment Division of Detrex, Warren County, Bowling Green, Kentucky* —On March 12, 1985, the state of Kentucky served upon Detrex a temporary restraining order with regard to this site, alleging certain violations under, *inter alia*, Kentucky Revised Statutes, Chapter 224, and seeking civil fines in the thousands of dollars. Detrex has expended sums for the cleanup of this site, as required by the state. Detrex also understands that the EPA has identified the Lost River, which runs underneath

---

**1.** In its complaint, Detrex alleges that policies have been purchased from Wausau approximately from the mid–1930's through February, 1977. In its answer, Wausau admits only that during the period 1950 to March 1, 1977, "Wausau and Detrex contracted for liability insurance pursuant to the terms and conditions of certain policies and insurance." Detrex does not dispute Wausau's statement that insurance contracts exist only for these years. However, Detrex says Wausau's Carmack admits coverage was provided to Detrex from the 1940's. To decide the issues in this motion it is unnecessary to resolve this dispute over the period of Wausau's coverage of Detrex.

this site, as a Superfund site under CERCLA. Wausau received notice of such proceeding in Detrex's interrogatory answers of December 16, 1985; in addition, Detrex notified Wausau of such proceeding on June 26, 1986.

d. *Gold Shield Facility, Grand Rapids, Michigan* —On November 21, 1985, the Michigan Department of Natural Resources demanded that Detrex submit "a work plan" regarding purported discharges of substances at this site. Detrex notified Wausau of such proceeding on November 14, 1985, and December 5, 1985.

e. *Cemetery (Milford Road) and Rose/Springfield sites, Rose Township, Oakland County, Michigan* —On June 18, 1985, the EPA demanded, pursuant to CERCLA, that Detrex perform certain work to eliminate discharges of substances at the Cemetery site. On October 29, 1982, the EPA made a similar demand upon Detrex regarding the Rose site. Wausau received notice of such proceeding as a result of a related suit in 1979 in which Wausau defended Detrex and in Detrex's interrogatory answers of December 16, 1985; in addition, Detrex notified Wausau of such proceeding on June 26, 1986.

f. *New Lyme Landfill, Ashtabula County, Ohio* —On May 20, 1985, the EPA demanded, pursuant to CERCLA, that Detrex perform certain work to eliminate discharges of substances regarding the New Lyme site. Wausau received notice of such proceeding in Detrex's interrogatory answers of December 16, 1985. Detrex notified Wausau of such proceeding on June 26, 1986.

In its first claim for relief, Detrex states that Wausau has failed to honor its defense obligations and has either disputed, or will

dispute, its "obligation to defend and to pay in full Detrex's defense costs in connection with the [identified] proceedings." As to this claim for relief, Detrex prays that this court determine and declare

[t]hat Wausau is obligated under its liability insurance policies to defend Detrex and to pay the costs of defense, in such proceedings.

In its second claim for relief, Detrex says that Wausau has failed to "agree to provide full indemnity in such proceedings or has disputed, or will dispute, its obligations to do so." As to this claim for relief, Detrex asks this court to determine and declare that Wausau is "obligated under its liability insurance policies to pay in full all sums that Detrex becomes legally obligated to pay as a result of such proceedings."

In its answer, defendant Wausau denies that it has any defense obligations as alleged, but it admits that an actual controversy exists between plaintiff and defendant regarding any alleged defense obligation of defendant.[2]

On August 21, 1986, plaintiff Detrex filed its motion for partial summary judgment. It seeks a declaration that "Wausau is obligated to investigate, defend, and pay in full for the defense of actions against Detrex instituted by the United States Environmental Protection Agency and state agencies as well as judicial actions."[3]

Wausau disputes the argument of Detrex that, for the purpose of determining whether the "duty to defend" exists, there is no difference between the nine "environmental matters." Wausau asserts that "[c]learly, each of the subject environmental matters must be considered separately and on its own merits."

The court will first examine and interpret the policy provisions. Then it will take up the Fields Brook site in Ashtabula County,

---

**2.** So far, Wausau has not filed, or sought leave to file, an answer to the plaintiff's first amended complaint.

**3.** In its complaint, defendant Detrex asserted that plaintiff had given defendant "notice of environmental claims, or potential claims" and uses the word "claims" throughout. As seen in its first amended complaint, Detrex says that it has given "notice of environmental proceed-

ings." At no point does it employ the word "claims." But now, in its motion for partial summary judgment Detrex speaks of the "defense of actions against Detrex instituted by the United States Environmental Protection Agency and state agencies as well as judicial actions." The court will use the neutral term "environmental matter," adopted by the defendant.

and apply the policy provisions, as interpreted, to that environmental matter. The court commences with the Fields Brook site because conclusions reached in applying the policy provisions to this environmental matter are applicable to several of the other environmental matters presented in plaintiff Detrex's declaratory action.

## I.

■ The court examines the policy provisions mindful that "where the meaning of the writing is clear and unambiguous upon its face, the words therein are to be understood in their plain, ordinary and popular sense." *United States Fidelity & Guaranty Co. v. Guenther*, 281 U.S. 34, 50 S.Ct. 165, 74 L.Ed. 683 (1930).

The Wausau policies contain the following insuring language:

The company will pay on behalf of the insured the sums which the insured shall become legally obligated to pay as damages because of

Coverage A.   Bodily Injury or

Coverage B.   Property Damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent and may make such investigation and settlement of any claim or suit as it deems expedient, but the company, shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Thus, the insuring language of Wausau's policies obligated Wausau to "defend any suit against [Detrex] seeking damages on account of such bodily injury or property damage." This is true "even if any of the allegations of the suit are groundless, false or fraudulent...." The insurance policies do not define the term "suit," and standing alone the meaning of "suit" may be somewhat ambiguous. Nevertheless, the insuring language, just quoted, helps to mark out the meaning of "suit" as used. Thus, "allegations of the suit" indicate that a "suit" is composed of "allegations." This implies that the traditional meaning of "suit" is intended, i.e. that it contains allegations which seek "damages" on account of either "personal injury" or "property damage." [4]

While the insuring language imposes a duty to "defend any suit against the insured," the language further authorizes Wausau to "make such investigation or settlement of any claim or suit as it deems expedient." Thus, the language differentiates the term "claim" from "suit." The insuring language makes it clear that the duty to defend applies to a "suit against the insured," as distinguished from a "claim" against the insured.[5] Similarly, in the clauses which place limitations on liability, the policy reads "[r]egardless of ... claims made or suits brought...."

As seen, Wausau's duty to indemnify extends to all

person or persons against another or others in a court of justice in which the plaintiff pursues, in such court, the remedy which the law affords him for the redress of an injury or the enforcement of a right, whether at law or in equity.

**4.** The generic term "suit" is defined similarly in Bouvier's Law Dictionary (1928) and Black's Law Dictionary (5th ed. 1979):

*Bouvier:*

It is more general than 'action,' which is almost exclusively applied to law, and denotes any legal proceeding of a civil kind brought by one person against another....

*Suit* is a generic term of comprehensive signification, and applied to any proceeding in a court of justice in which the plaintiff pursues, in such court, the remedy which the law affords him for the redress of an injury or the recovery of a right.

*Black's:*

*Suit.* A generic term, of comprehensive signification, referring to any proceeding by one

**5.** This distinction is again made clear in the policy language that deals with notice to the insurance company:

*Notice of Claim or Suit*

If claim is made or suit is brought against the insured, the insured shall immediately forward every demand, notice, summons, or other process received by him or his representative.

sums which [Detrex] shall be legally obligated to pay as damages because of

A. bodily injury

B. property damage....

This insuring language obligates Wausau [t]o pay on behalf of an insured all damages that the insured 'shall become legally obligated to pay' or liability 'imposed by law' [and] is a description of the kind of liability insurer agreed to undertake and is not a designation of a particular forum which must establish the legal liability.

7C J. Appleman, *Insurance Law and Practice* § 4682, at 25 (rev. ed. 1979).

According to general insurance law, an insurer's duty to defend "suits" exists independently from its obligation to pay for property damage or personal injury. *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 654 F.Supp. 1334, 1346 (D.D.C.1986); *Buckeye Union Insurance v. Liberty Solvents & Chemicals*, 17 Ohio App.3d 127, 477 N.E.2d 1227, 1230 (Ct.App.1984). The broad scope of this independent duty to "defend any suit against the insured" is thus explicated in *Willoughby Hills v. Cincinnati Ins. Co.*, 9 Ohio St.3d 177, 459 N.E.2d 555 (1984):

> Where the insurer's duty to defend is not apparent from the pleadings in the action against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim.

*Id.*

While this case syllabus ends: "the insurer must accept the defense of the claim," the context of the entire syllabus makes it clear that it is the "action" or "suit," including the "claim," but not the claim alone, that the insurer must defend.

**6.** In *Marvel Heat Corp. v. Travelers Indemnity Co.*, 325 Mass. 682, 92 N.E.2d 233 (1950), an insured settled a claim with a customer and sued the insurer for the amount of the settlement and his attorney's fees. The Massachu-

The insuring language's differentiation between the terms "suit" and "claim" is recognized in insurance law:

> The mere fact that a claim has been asserted against the insured does not impose any duty of 'defense' upon the insurer, since until an action has been brought against the insured there is, by definition, no claim against which the insured is required to defend.

*Couch on Insurance*, § 51:43 (2d rev. ed.). One authority there cited is *Fisher v. Hartford*, 329 F.2d 352 (7th Cir.1964). In *Fisher*, a party sought to claim attorney's expenses and fees for alleged breach of the defense clause. While a specific amount was claimed, the Seventh Circuit nonetheless ruled that the trial court did not err in "excluding from consideration claims of Attorney Fisher for services rendered before the filing of suit." *Id.* at 354.[6]

Consequently, it is clear from the terms contained in the Wausau policies that a claim for damages made against Detrex that might result in its legal liability is not synonymous with a "suit" and therefore the making of the claim is not enough to trigger the duty to defend.

## II.

### A.

With the policy insuring language thus analyzed, attention is now turned to whether Wausau has a duty to defend Detrex against the EPA in the Fields Brook environmental matter. To determine whether this environmental matter is a "suit" which Wausau must defend, it is essential to first review the facts of record.

From 1950 until at least 1972, Detrex operated a plant in Ashtabula County, Ohio, at a location known as the Fields Brook site. Detrex discharged effluent into Fields Brook and into a storm sewer.

Under date of March 15, 1982, the EPA wrote Detrex at Ashtabula, Ohio. It stated

setts Supreme Judicial Court upheld a finding for the defendant insurance company, noting, among other things, that at no time had an action been brought against the plaintiff.

it was "considering spending public funds to investigate and take corrective action involving releases, or threatened releases of hazardous substances, pollutants and other contaminants at the above-referenced site." It informed Detrex that under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA),[7] "the responsible parties may be liable for money expended by the government to take necessary corrective action at the site." After explaining who might be a potentially responsible party, the letter stated that the "EPA believes that your Company may be a responsible party" and that before "the government undertakes necessary action at this site, we desire to discuss your Company's voluntarily performing the required work to abate any releases or threatened releases of hazardous substances, pollutants, or contaminants from the site." It then stated that "[i]f private cleanup is not forthcoming and we use public funds, your Company may be liable for the costs incurred."

After four years went by, the EPA wrote Detrex, on May 16, 1986, via its Washington attorney, regarding the Fields Brook Site, Ashtabula County, Ohio:

> EPA has documented the releases or threatened releases of hazardous substances, pollutants and contaminants at the above referenced site. EPA is planning to spend public funds to control and investigate these releases.

Based on its investigation of conditions at the site, the EPA stated that it believed that Detrex was a responsible party. Noting that it was completing a current remedial investigation/feasibility study (RI/FS) "to address contamination in the brook," it stated:

Before undertaking any necessary remedial action at the site, however, U.S. EPA will request that the responsible parties voluntarily perform work required to abate any releases or threatened releases of hazardous substances, pollutants, and contaminants.

The EPA letter sought information from Detrex and concluded by "strongly encouraging" Detrex to submit a written response within the time frame specified herein.

On July 18, 1986, the EPA again wrote Detrex regarding Fields Brook. The letter stated that it had conducted the following studies at the site:

1. A remedial investigation, completed in 1985, to determine the nature and extent of surface water, and sediment contamination at the site; and

2. A feasibility study, Sediment Operable Unit, to identify the most environmentally sound and cost effective remedy for correcting the hazard presented.

The letter then stated that the EPA was prepared to "discuss voluntary and proper performance of the Sediment Operable Unit remedy by you, solely or as a group of potentially responsible parties, and would like to encourage good faith negotiations between you and the Agency and among you and other parties potentially responsible for the site." Continuing, the letter stated "[t]o facilitate discussions among yourselves, a list of potentially responsible parties is enclosed." Eighteen different companies were listed under the heading "Fields Brook, Ashtabula County, Ohio *potentially responsible parties.*" (emphasis added).

As indicated, a remedial investigation of the Fields Brook site was made in March 1985. In July 1986, a feasibility study—

---

7. In 1980, Congress enacted legislation, known as the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), Pub.L. No. 96–510 (codified at 42 U.S.C. § 9601–57), that provided the President (and through him the EPA) with the authority to deal with the problem of hazardous waste contamination in America. CERCLA established a 16 billion dollar "Superfund" to finance the cleanup of hazardous waste sites, 42 U.S.C. § 9631; authorized federal cleanup of waste releases us-

ing Superfund resources, 42 U.S.C. § 9604; required the publication of a National Contingency Plan (NCP) establishing "procedures and standards for responding to releases of hazardous substances", 42 U.S.C. § 9605; and made generators, transporters and disposers of hazardous wastes (so called "responsible parties") liable for hazardous waste cleanup, 42 U.S.C. § 9607(a)(1)–(4), including, under 42 U.S.C. § 9607(a)(4)(A), cleanup costs incurred by the federal or state government.

Fields Brook Sediment Operable Unit was completed. Thereafter, the EPA prepared a "Summary of Remedial Alternative Selection," and a "Responsiveness Summary" was completed in September 1986. In preparing the feasibility study, comments from members of the public and potentially responsible parties were received. The foregoing documents were considered by Regional Administrator Adamkus in preparing his Record of Decision—remedial alternative selection.[8] He noted that these documents described the analysis "of the cost effectiveness of remedial alternatives for the Fields Brook Sediment Operable Unit, Ashtabula County, Ohio," and he based his decision on these documents. In accordance with CERCLA and the National Contingency Plan, he determined the following:

> Excavation and thermal treatments/land filling of Fields Brook sediment is a cost effective remedy and provides adequate protection of public health, welfare, and the environment. The State of Ohio has been consulted and agrees with the approved remedy. In addition, the action will require future operation and maintenance activities to insure the continued effectiveness of the remedy. These activities will be considered part of the approved action and eligible for Trust Fund monies for a period of one year.

According to the representations of counsel, no further regulatory or administrative actions have been taken with respect to Fields Brook.

### 1.

■ Detrex contends that it is made a party to EPA ... actions in which a definable claim or contention is asserted that Detrex has some legal liability for damage to property. That certainly is a 'litigous process' which Wausau must defend.

Wausau counters that the word

'suit' is the prosecution of some demand in a court of justice. It is a common

place, unambiguous term understood by both lawyers and non-lawyers.

This court now examines these rival contentions in light of and in connection with the record heretofore developed relating to the Fields Brook Site, and the previous interpretation of the Wausau insuring language.

Upon the foregoing undisputed factual record, it is found, and it is determined, that in the words of Section 113(k)(2)(D), of CERCLA, as amended, the EPA is making "reasonable efforts to identify and notify potentially responsible parties as early as possible before selection of a response action." Moreover, it is also evident that a Record of Decision has now been issued which selects a response action to remedy the contaminants and pollutants which apparently exist at the Fields Brook site. Nonetheless, the record does not indicate that the EPA Administrator has adopted the Record of Decision, nor has an administrative order under section 9604 or section 9606 of CERCLA yet been promulgated by the EPA Administrator. If the potential responsible parties do not do the job, it seems likely from the record in this case, and from the Record of Decision of the Regional Administrator, that the EPA ultimately will use superfund monies to clean up the Fields Brook site. Yet, it is evident that, at this point, the EPA has not yet done so. Necessarily therefore, the EPA has not yet undertaken to recover cleanup costs from any of the 18 identified potentially responsible persons, including Detrex.

Nevertheless, Detrex asserts that Wausau's "duty to defend any suit" brought against it includes the "PRP demand letters." However, under the foregoing circumstances it is evident that neither the PRP letters (March 15, 1982; May 16, 1986; July 18, 1986) nor the Record of Decision of October 6, 1986, has legally obligated Detrex to pay any sum of money to the

---

8. A Record of Decision (ROD) is used to document the EPA's remedial decision making process and to demonstrate that the requirements of CERCLA and the National Contingency Plan

(NCP)—the basis response implementation regulation—have been met. *See* 40 C.F.R. § 300.68 (1985).

government or to anyone else. Thus, no possibility of a duty to indemnify, under the insurance policies, has arisen, or so far could arise.

In addition, under CERCLA it is evident that this environmental matter has not yet reached the "suit" stage. The matter would be at the "suit" stage should the EPA under 42 U.S.C. § 9606, apply for an injunction in the district court to compel Detrex alone, or Detrex and other potentially responsible parties, to clean up or abate the actual or threatened release of contaminants or pollutants. Also, this environmental matter would reach the "suit" stage if the EPA should perform the cleanup work itself on the Fields Brook site and sue Detrex alone or jointly with other potentially responsible parties for reimbursement under 42 U.S.C. §§ 9604, 9607. At least so far, the EPA has not resorted to any of these alternative statutory actions.

At the present stage of this environmental matter, it is concluded that the PRP letters, taken together with the Record of Decision and its attachments, constitute a claim against Detrex under the insuring language of the insurance policies. It is true that the PRP letters only speak of liability which Detrex *may* face together with other PRP's in the future. However, the Record of Decision and its attachments projects that "remedial alternative selection has a present worth of 48.4 million dollars." With this projection of a sum certain, the Record of Decision and its attachments taken together with the antecedent PRP letters are determined collectively to fall within the term "claim" in the insuring language of the insurance policy.

Nevertheless, as seen, *supra* part I, a claim for damages made against Detrex that might result in its legal liability is not synonymous with a "suit" so as to trigger Wausau's duty to defend Detrex under their insurance policies. Merely because the PRP letters to Detrex informed it that it might be liable for cleanup costs, penalties and punitive damages under CERCLA, does not mean that these letters meet the attributes of a "suit." Until, pursuant to

Section 9606, the EPA resorts to a court injunction or to a mandatory court order to enforce a section 9606(a) administrative order, or pursuant to section 9607 the EPA, in district court, seeks cleanup costs, a "suit" would not be brought against Detrex that would trigger Wausau's duty to defend.

2.

▇ Among the amendments to CERCLA, (provided in the "Superfund Amendments and Reauthorization Act of 1986"),[9] 42 U.S.C. § 9613(j)(2) states:

In considering objections raised in any judicial action under this chapter, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.

Further, Section 9613(j)(1) provides:

In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record....

Under sub-section (k)(1), the EPA is required to "establish an administrative record upon which [the EPA] shall base the selection of a response action...." In a removal action, under (k)(2)(A), the EPA shall promulgate

[r]egulations in accordance with chapter 5 of title 5 of the United States Code establishing procedures for the appropriate participation of interested persons in the development of the administrative record on which [the EPA] will base the selection of removal actions and on which judicial review of removal actions will be based.

Similarly, in a "remedial action" under sub-section (k)(2)(B) the administrative record is developed on which "judicial review of remedial actions will be based." However, at a minimum, the procedures developed under this sub-paragraph shall include:

9. SARA, Pub.L. No. 99–499 (October 17, 1986).

(i) Notice to potentially affected persons and the public, which shall be accompanied by a brief analysis of the plan and alternative plan that were considered.

(ii) A reasonable opportunity to comment and provide information regarding the plan.

(iii) An opportunity for a public meeting in the affected area, in accordance with section 617(a)(2) of this title (relating to public participation).

(iv) A response to each of the significant comments, criticisms, and new data submitted in written or oral presentations.

(v) A statement of the basis and purpose of the selected action.

*Id.*

Thus, in any judicial review that Detrex might seek in district court "of any issues concerning the inadequacy of any response action taken or ordered by EPA," Detrex would face two limitations. Detrex cannot initiate judicial review. It must wait for the EPA to file one of the enforcement actions mentioned above and only then may Detrex seek such judicial review; it may also at that time assert any defenses it may have under section 9607(b). Second, in such judicial review (but not in any assertion of a section 9607(b) defense) Detrex would be limited to the administrative record developed as described above.

With reference to the Fields Brook site, it appears that the EPA has already developed the administrative record on which Detrex might challenge the response action specified in the Record of Decision. As seen, Detrex may only challenge such response action should the EPA, by administrative order, adopt that response action and then seek to compel its enforcement under section 9606, or proceed with the designated cleanup remedial action, and thereafter seek reimbursement of cleanup costs from Detrex under section 9607.

While the administrative record for such future EPA action in district court apparently has been developed, since that action has not yet been filed, Wausau's duty to defend Detrex has not yet been triggered. However, it is concluded that by operation of law, the administrative record already developed would become a part of any future EPA enforcement action once it is filed. Therefore, it is determined and declared that defense costs so far expended by Detrex in developing the administrative record would then become reimbursable by Wausau, once the EPA action is filed.

## II.

### B.

The determination and declaration reached in part II.A. that Wausau's duty to defend has not yet been triggered with reference to the Fields Brook site environmental matter applies equally to the environmental matters described below: A review of the status of those environmental matters reveals that none of them present facts or conditions that materially differ from those contained in the Fields Brook site environmental matter. Therefore, the principles declared to be applicable to Fields Brook are determined to also be applicable to the following sites:

### (1)–*East Lyme Landfill*

By letter of May 15, 1985, the EPA notified Detrex that the New Lyme Landfill site had been placed on the National Priorities List of the nation's worst hazardous waste sites in December 1982. The EPA reported that it had conducted a remedial investigation as to ground water, surface water and soil contamination, and that it was "in the final stages of completing a feasibility study which identifies the most environmentally sound and cost effective remedy for correcting the hazards presented by the site." It indicated that there would be later notification of a meeting to discuss the completed feasibility report and that Detrex would be notified of the meeting. It encouraged good faith negotiations between Detrex and the agency and among the potentially responsible parties for cleanup of the site. The EPA announced that unless a substantial agreement to have the potentially responsible parties undertake the remedial design and remedial action (RD/RA) by April 25, 1986, it planned to proceed with the use of federal funds and begin the implementation of the Record of Decision. Sometime between

May and October of 1985, the EPA issued a Record of Decision dealing with this site.

No further regulatory or administrative action has occurred, nor has any suit been filed.

(2) *OAKLAND COUNTY, MICHIGAN, DUMP SITES: ROSE TOWNSHIP; CEMETERY (ROSE TOWNSHIP); SPRINGFIELD (SPRINGFIELD TOWNSHIP).*

On October 26, 1982, the EPA wrote Dextrex concerning the Rose Township Dump Site. It stated that "[t]he release of hazardous substances at the site has resulted in contamination of soil, surface water, and ground water"; and that the EPA "believes that you may be a party responsible for this release." It stated its intention to initiate a comprehensive field investigation and a feasibility study. It requested a meeting to discuss steps to be taken to accomplish the response activities and the possibility of a meeting with other parties who might be potentially responsible. However, no further regulatory or administrative action has been taken.

On June 18, 1985, the EPA wrote Detrex concerning the "Cemetery Site, Rose Township." It stated that it had documented the released or threatened release "of hazardous substances, pollutants and contaminates at the above referenced site, and is planning to spend public funds to control and investigate these releases." Further, the letter stated:

Based on data we received during our investigation concerning the hazardous substances at this site, the Rose Township site, and the Springfield site, EPA has information that indicates that you and/or your firm may be a responsible party.

While the letter seems to refer only to the Cemetery Site, this sentence is broad enough to charge Detrex as being a potentially responsible party both as to the Cem-

etery Site and the Springfield [Township] Site.

The EPA informed Detrex that it was conducting a feasibility study and a remedial investigation and continuing an investigation to identify other potentially responsible parties. In addition to asking for a specific information, the EPA strongly encouraged Detrex "to submit a written response" by July 18, 1985. No other action has been taken by the EPA.[10]

## II.

## C.

■ Plaintiff Detrex contends that Wausau's obligation to " 'defend any suit against [the insured] seeking damages' creates an obligation to defend any claim or action." Thus, Detrex would equate "claim" with "suit." Accordingly, Detrex argues that whatever PRP letters the EPA has sent to Detrex in the subject environmental matters are "claims" which are the functional equivalents of "suits." The principal cases cited by Detrex to support this argument are examined and rejected.

In *Fireman's Fund Insurance Co. v. Ex–Cell–O Corp.*, 662 F.Supp. 71 (E.D. Mich.1987), the Honorable John Feikens thus posed the issue before him:

Ex–Cell–O Corporation ("Ex–Cell–O"), its subsidiary McCord Gasket Corporation ("McCord"), and McCord's subsidiary Davidson Rubber Company ("Davidson") ("policyholders") moved for partial summary judgment declaring the duty of Fireman's Fund Insurance Companies ("Fireman's Fund"), Wausau Insurance Companies ("Wausau"), and Zurich Insurance Company ("Zurich") ("primary insurers" or "insurers") to defend the policyholders against potential liability for allegedly contributing to environmental contamination at twenty-two locations.

At 73–74. After referring to CERCLA *supra,* the

---

**10.** The PRP letter dealing with the Cemetery Site stated that the EPA "is planning" to spend public funds to control and investigate the releases. This contrasts with the letter regarding the Rose Township Dump Site which states only that the EPA "may expend public funds for this purpose."

Michigan court observes that the "policy holders have received written notice, familiarly known as a 'PRP letter,' from a government agency that considers them potentially responsible for contamination at 16 sites." At 74. As to the other six sites, the court notes agency action, or imminent agency action at five sites and involvement of a policyholder in a federal court action in the twenty-second site. At 74.

The critical insuring language quoted in *Ex–Cell–O* is the same as the language in the policies in the instant case. On the "duty to defend" issue, Judge Feikens' held that "a 'suit' includes any effort to impose on the policyholders a liability ultimately enforceable by a court, and that 'damages' include money spent to clean up environmental contamination." At 75. Thus, he required the insurance companies to defend their policyholders because, in his view, a "PRP" letter is an "effort to impose on the policyholders a liability ultimately enforceable by a court." This court respectfully declines to take the position declared by Judge Feikens. For the reasons previously stated, this court is unable to equate a "PRP letter" with a "suit," and therefore, this court has declined at this stage of the environmental matters considered in part I. A. and B., to require Wausau to defend Detrex.

Analysis of Judge Feikens' holding discloses a basic legal premise that is not acceptable. Citing *Detroit Edison Company v. Michigan Mutual Insurance Company*, 102 Mich.App. 136, 301 N.W.2d 832 (1980), Judge Feikens states: "The [insuring language] obligates the insurers to defend any claim against the policyholders 'so long as the allegations against the insured *even arguably* come within the policy coverage.'" (emphasis original, at 75).

*Detroit Edison Company* does not equate an insurer's duty to defend a claim, with the duty to defend a suit. Indeed, the Michigan Court of Appeals speaks only of a "suit" in defining an insurer's duty to defend. Thus, the court declares:

The duty of an insurer to defend the insured depends upon the allegations in the complaint of the third party in his or her action against the insured. This duty is not limited to meritorious suits and may even extend to actions which are groundless, false, or fraudulent, so long as the allegations against the insured *even arguably* come within the policy coverage. An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy. *Dochod v. Central Mutual Insurance Co.*, 81 Mich.App. 63, 264 N.W. 2d 122 (1978).

*Detroit Edison*, 102 Mich.App. at 140, 301 N.W.2d at 835.

The *Ex–Cell–O* court then declared:

The insurers claim they have no duty to defend the environmental claims until the policyholders become defendants in a traditional lawsuit for money damages. The insurers construe their policies too narrowly: coverage does not hinge on the form of action taken or the nature of relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by a policyholder. In *United States Aviex Company v. Travelers Insurance Company*, 125 Mich. App. 579, 586 (1983), an insured won judgment declaring its insurer's duty to defend based only on "threats of legal action" by the Michigan Department of Natural Resources.

At 75. However, the *Aviex* case cited by the *Ex–Cell–O* court does not involve EPA "PRP" letters nor action comparable to an EPA action. It is apposite to the facts of the instant case. Therefore, the case does not directly support the position of Detrex.

In considering whether Aviex could resort to a declaratory action, the court stated:

In this case, plaintiff was faced with threats of legal action by the DNR. Although, as defendant argued, the DNR could seek legal redress in the form of an order for abatement of water pollution ..., a criminal complaint .., ..., or injunctive relief ..., and so possibly never seek a remedy covered by the insurance policy, the plaintiffs nevertheless needed

to know whether defendant would be *required to defend against a covered remedy should such a remedy be sought.* Only with this knowledge could plaintiff choose between voluntarily complying with the DNR's very real and repeated demands and opposing the DNR's actions. (emphasis added).

*Aviex*, 125 Mich.App. at 584, 336 N.W.2d at 841. Thus, the appellate court dealt with the defendant's duty to defend, but only in a cursory way. The court did not analyze how the trial court could hold that "under the insurance policy, defendant was obligated 'to defend any claim or action ...'", when the express insuring language limited the defendant's duty to defend to "any suit against the insured seeking damages." Because of the failure of the Michigan appellant court to analyze the express insuring language that limited the insurer's duty to defend to a "duty to defend any *suit*" (emphasis added), this presents an additional reason that convinces this court not to follow *Aviex* as an authority on the issue of an insurer's duty to defend in the context of an environmental matter.

Detrex relies heavily on *Technicon Electronics Corp. v. American Home Assurance Co.*, No. 08811/85 (N.Y.Sup.Ct. Feb. 18, 1986), *appeal docketed*, (N.Y.App.Div. Mar. 20, 1986). Plaintiff Technicon sought a declaratory judgment that defendant insurance companies were obligated to investigate, defend and pay in full a pending lawsuit and "a proceeding involving the United States Environmental Protection Agency." The EPA had informed Technicon "that it might be potentially responsible for the cleanup and emergency response costs connected with the Frontera Creek in Humacao, Puerto Rico," costs allegedly incurred as a result of property damage "caused by exposure to hazardous substances discharged from Technicon's plant in Puerto Rico."

The *Technicon* court relied on the well-established rule in New York that an insurance company's duty to defend is broader than its duty to indemnify and is activated when there is any possibility of coverage. (*Goldberg v. Lumber Mutual Insurance Co.*, 297 N.Y. 148, 154, 77 N.E.2d 131.) After examining other New York cases with congruent principles, the court granted plaintiff's motion for summary judgment and denied the defendants' motion, stating, "[d]efendants have failed to establish that there is no possible factual or legal basis on which they might eventually be obligated to indemnify Technicon against liability." *Technicon*, slip op. at 4.

At no point in its opinion did the court acknowledge or discuss the policy language that expressly requires the existence of a "suit" before the insurer's duty to defend arises. Nor does the court explain how the EPA environmental matter meets that policy requirement or would invoke the duty to "defend any suit."

In view of the *Technicon* court's failure to analyze the policies' critical insuring language, the court's determination that the insurers had a duty to defend Technicon does not provide persuasive authority.[11] Moreover, this court declines to follow, as Detrex claims, but the record does not show,

> that a major issue resolved in favor of the policyholder, was whether a PRP demand letter constitutes a suit which the insurance carrier must defend.

### III.

#### A.

■ Detrex has operated the Equipment Division Site since 1955 in Warren County, Kentucky, at Bowling Green. On March 8, 1985, the National Resources and Environmental Protection Cabinet of the State of

---

11. In addition to the foregoing cases on which it relies, Detrex has cited and argued a number of other cases which the court does not discuss. This is also true of cases which Wausau has cited and argued. While all of these cases have been considered, the court concludes that none alter or modify the determinations and declarations which this court has reached and set forth.

The court appreciates the comments of counsel concerning this court's decision in *Tricil Resources, Inc. v. Mutual Fire, Marine and Inland Insurance Co.*, C85-1302A (N.D.Ohio, Sept. 19, 1986) which this court brought to counsel's attention. It is concluded that none of the holdings in Tricil affect or control the present determinations and declarations.

Kentucky (Cabinet or State of Kentucky) filed its complaint against Detrex in *Commonwealth of Kentucky v. Detrex Chemical Industries.*

In the first count of the complaint, plaintiff Cabinet alleged that Detrex's facility was discharging "waste water into waters of the Commonwealth" without the previous "issuance or existence" of permits required by Kentucky Revised Statutes and regulations. As specified, it was alleged that Detrex "violated conditions applicable to its discharge of pollutants from a point source into waters of the commonwealth." Further, it was alleged that the "violations were confirmed on February 21, 1985" by "an inspection of the Warren County facility, notice of which was given to Detrex," and an inspection of February 27, 1985 "revealed that the discharge of pollutants from point sources to waters of the Commonwealth was continuing." In the second count of the complaint, plaintiff Cabinet alleged that drums of hazardous waste were stored by Detrex without the permits required by law.

In its prayer for relief, the Cabinet sought temporary and permanent injunctive relief from the discharge of pollutants "from point sources to the waters of the Commonwealth" until Detrex "obtained and complied with all conditions of a KPDES permit." Civil monetary penalties were sought for each day of violation as assessed under two Kentucky statutory provisions. On March 8th, the day the complaint was filed, Circuit Judge Corns issued a temporary order that restrained Detrex "from discharging pollutants from existing point sources, into waters of the Commonwealth."

According to a June 26, 1986 letter from Detrex's general counsel to Wausau's Environmental Claim Unit Supervisor (requesting that Wausau undertake to defend and indemnify Detrex), Detrex "expended considerable sums to clean up [the Equipment Division] site, as directed by the State of Kentucky." Previously, on April 23, 1985, Commonwealth counsel wrote Circuit Judge Corns, with consent of Detrex counsel:

I have enclosed a draft of an order dissolving the temporary restraining order issued in this action, based upon the Cabinet's inspections of the Detrex facility and its conclusion tehat the facility is now operating in conformance with the conditions imposed in the order.

The dissolution Order thereafter entered, declared that the "defendant Detrex Chemical Industries, Inc. has taken affirmative action to assure that it is in compliance with the Temporary Restraining Order issued March 8, 1985, [and] the Plaintiff having observed that compliance."

Because the Cabinet brought suit against Detrex for injunctive relief in the Circuit Court of Warren County, Kentucky, the first element to show that Wausau has a "duty to defend any suit" was satisfied. However, the insuring language further requires that the suit against Detrex must be "seeking damages on account of ... property damage." To meet the second requirement, Detrex must show that, although the suit was primarily for injunctive relief, the Cabinet was nevertheless seeking "damages on account of ... property damage."

Generally, as Wausau argues, a suit for equitable relief has been "found to be outside the duty to defend set forth in policies of general liability insurance." *See Aetna Casualty and Surety Company v. Hanna,* 224 F.2d 499, 503 (5th Cir.1955); Annotation, *Liability Insurer's Duty To Defend as Including Injunction Proceedings,* 53 A.L.R.2d 1132 (1957). However, the Cabinet sought civil penalties as well against Detrex. Wausau argues that "[p]ublic policy precludes insuring against liability for [a] 'civil penalty' of the type constituting the remaining two prayers for relief in the complaint." Countering, Detrex states, "while public policy generally precludes insurance against liability for non-vicarious punitive damages and criminal sanctions, civil penalties, such as those imposed under CERCLA, are remedial and compensatory in nature." In one of the three supporting cases, cited by Detrex, *United States v. W.B. Enterprises, Inc.,* 378 F.Supp. 420 (S.D.N.Y.1974), it was noted that the Feder-

al Water Pollution Control Act, 33 U.S.C. § 1321(b) authorized the Secretary of the Interior to determine that environmental damage resulted from a discharge of oil. The court then stated

> the penalty assessed in this case was clearly a civil, remedial penalty designed to compensate the government for this harm. It does not matter that the quantum of damage is incapable of precise measurement.

*Id.* at 422–23.[12]

In reviewing the complaint and the Kentucky statutes involved, it can nowhere be seen that Kentucky was seeking compensation for property damage or personal injury. Kentucky solely sought penalties for Detrex's failure to comply with its statutory regulations. These statutes set up a series of conditions which must be complied with in order to obtain a permit to either store toxic waste or to emit limited amounts of toxic pollutants into the waters of the Commonwealth of Kentucky. These statutes also set up monetary penalties for the failure to obtain a permit and/or comply with the conditions for the storage of toxic waste or emission of toxic pollutants.

Of course, Detrex has no duty to conclusively prove that any property damage to the State of Kentucky was caused by the alleged emissions of pollutants into the waters of Kentucky. But since the Cabinet did not allege any such property damage, Detrex has not shown any possible basis to show "damages on account of property damage," the second duty to defend requirement.

Thus, the civil penalties asked for by the Cabinet were clearly not a criminal sanction. Moreover, under the teaching of *W.B. supra,* it may be assumed that the penalties were "designed to compensate" the State of Kentucky for any harm to the

waters of Kentucky that was caused by Detrex's "discharge of pollutants into waters of the Commonwealth." Nevertheless, on the record before the court there are no facts that support the assumption that harm was actually caused to the waters of Kentucky. Hence, there is no showing of "property damage" to the natural resources of the State of Kentucky. As a matter of law, on this record it is not possible to determine that in the Warren County, Kentucky Circuit suit it is arguable that Detrex might have been legally liable for damages because of "property damage" to the natural resources of the State of Kentucky. On this record Detrex has not factually supported its claim that in the Warren County, Kentucky Circuit Court suit Detrex might have been legally liable for "damages on account of ... property damage to the State of Kentucky." Hence, Detrex has not established the second requirement needed to trigger Wausau's duty to defend the Warren County Circuit Court suit against Detrex, brought by the State of Kentucky.

### III.

### B.

### (1)

*Gold Shield Site*

■ Since 1966, Detrex has operated Gold Shield Solvents. This Detrex division is composed of ten facilities around the country, providing bulk storage, reclamation and storage services for companies using industrial solvents.

On a routine visit in November 1985, personnel from the Michigan Department of Natural Resources (DNR) found "stains at the soil surface between the plant build-

---

12. Detrex also cites *True v. United States,* 603 F.Supp. 1370, 1374 (D.Wyo.1985) and *United States v. Marathon Pipe Line Co.,* 589 F.2d 1305, 1309 (7th Cir.1978) for this proposition.

*True, W.B., and Marathon* are not comparable to the instant case. *True* dealt with whether penalties under the Clean Water Act could be deductible for federal income tax purposes. *W.B.* dealt with whether a civil penalty for the violation of the Act could be imposed when the

defendant had cleaned up the accidental oil leakage, and *Marathon* dealt with whether more than a nominal civil penalty could be imposed under the Act when the discharge was the fault of a third party. None of these cases dealt with the issue of whether a suit seeking civil penalties was the equivalent to a suit seeking property damages for the purposes of an insurance policy.

ing and the nearest rail spur...." EDI Engineering, *Results of Investigation of Soil Quality for Gold Shield Solvents* (June, 1986).

This area is owned by the City of Grand Rapids. Thereafter, on November 21, 1985, the DNR sent a letter to Detrex informing it that its Grand Rapids facility was in violation of a Michigan Law prohibiting "the discharge of any substance which is or may become injurious to the waters of the state."

The letter went on to state that Detrex should submit to the Michigan DNR a plan to rectify the situation and that failure to do so "will result in the initiation of legal action pursuant to the enforcement provisions of Act 245, PA of 1929, as amended, Sections 9 and 10."

Whether the actions of the DNR with reference to the Grand Rapids, Gold Shield site constitute a "suit" within the Wausau insuring language, as interpreted, *supra*, requires this court to consider the Water Resources Commission Act (WRCA), *Mich. Stat.Ann.* § 3.521 *et seq.* (Callaghan 1985) [M.C.L.A. § 323.1 et seq.], (referred to in the DNR letter as 1929 Mich.Pub.Act § 245, as amended). The WRCA created the Water Resources Commission to "protect and conserve the water resources of the state." The "statutory authority, pow-

ers, duties, functions and responsibilities of the Water Resources Commission" were then transferred to the DNR by virtue of *Mich.Stat.Ann.* § 13.20(1) (Callaghan 1985) [M.C.L.A. § 299.11]. Under the WRCA, the DNR is empowered to "prohibit the pollution of any waters of the state and the Great Lakes." [13]

Section 3.527 [M.C.L.A. § 323.7] [14] explicitly provides for disposition of a case without a hearing where the alleged polluter "agrees with the terms of the proposed permit and period of time for abatement of pollution which the Commission deems necessary." In *White Lake Improvement Ass'n. v. City of Whitehall*, 22 Mich.App. 262, 276–77, 177 N.W.2d 473 (1970), it was found that such an agreement constitutes an "order" of the DNR and may be attacked by an interested or aggrieved person pursuant to section 3.528 [M.C.L.A. § 323.8].

An adjudicatory process is set forth in section 3.528(a) [M.C.L.A. § 323.8(a)]:

(a) Whenever any person shall feel himself aggrieved by the restriction of polluting content, waste or pollution, or any other order or permit of the commission, or any stipulation or consent order executed pursuant to section 7, he may file a sworn petition with the commission, setting forth the grounds and rea-

**13.** The DNR may seek legal redress "in a court of competent jurisdiction" for any such pollution in the form of an order for abatement under § 3.526(c) [M.C.L.A. § 323.6(c)], a criminal complaint under § 3.529 [M.C.L.A. § 323.9] or injunctive relief pursuant to § 3.529(1) [M.C.L.A. § 323.10].

**14.** Section 3.527(2) [M.C.L.A. § 323.7(2)] provides:

(2) Whenever in the opinion of the commission [a] person is causing or is about to cause unlawful pollution of the waters of this state, the commission may notify the alleged offender of its determination. The notice shall contain, in addition to a statement of the specific violation which the commission believes to exist, a proposed permit or other action which it deems appropriate to assure timely correction of the problem and shall set a date for a hearing on the facts and proposed action involved, the hearing to be scheduled not less than 4 weeks nor more than 8 weeks from the date of the notice of determination. Extensions of the date of hearing may be granted by the commission or on request. At

the hearing, any interested party may appear, present witnesses, and submit evidence. A person who has been served with a notice of determination may file a written answer thereto before the date set for hearing or at the hearing may appear and present oral or written testimony and evidence on the charges and proposed requirements for abatement of pollution contained therein. If a person served with the notice of determination *agrees with the terms of the proposed permit* and period of time for abatement of pollution which the commission deems necessary and notifies the commission thereof before the date set for hearing, disposition of the case may be made with the approval of the commission by issuance of a permit without further hearing. The permit approved and issued by the commission following the hearing as authorized by this section shall be conclusive, unless reviewed in accordance with Act No. 306 of the Public Acts of 1969, as amended.... (emphasis added).

sons for his complaint and asking for a hearing of the matter involved. The commission shall thereupon fix the time and place for the hearing and notify the petitioner thereof. At the hearing the petitioner and any other interested party may appear, present witnesses and submit evidence. Following the hearing, the final order of determination or permit of the commission upon such matter shall be conclusive unless reviewed in accordance with Act No. 306 of the Public Acts of 1969[, as amended,...].

The Administrative Procedures Act, *Mich.Stat.Ann.* § 3.560(101) (Callaghan 1985) [M.C.L.A. § 24.201] (referred to in §§ 3.528(a) [M.C.L.A. § 323.8(a)] and 3.527(2) [M.C.L.A. § 323.7(2)] as "No. 306 of the Public Acts of 1969") provides for judicial review of a final order or decision of an agency "without a jury and shall be confined to the record. In a case of alleged irregularity in procedure before the agency, not shown on the record, proof thereof may be taken by the court." Section 3.560(205) [M.C.L.A. § 24.305] allows additional evidence to be submitted on review if timely application is made, the record below was incomplete or that additional evidence is material and "there there were good reasons for failing to record or present it in the proceeding before the agency...." *Id.*

This court now lays along side this condensation of the WRCA and its relevant provisions for administrative proceedings and provisions for judicial review, the meaning of "suit," as used in the Wausau insuring language.

As seen, *supra note* 4, the word "suit" is a generic term of "comprehensive signification." While historically "suit ... applies to any proceeding in a court of justice," this court concludes that the term, as used in the insuring language of the Wausau policies, is not limited to a proceeding in a traditional court of justice. The term "suit" includes its functional equivalent, the commencement of an action before an administrative agency acting in a judicial capacity. *See Solo Cup v. Federal Insurance Co.,* 619 F.2d, 1178, 1188, n. 7 (7th Cir.1980).

■ An administrative board acts in a judicial capacity when it hears evidence and witnesses, the parties are given an opportunity to brief and argue their versions of the facts and present arguments, and the parties are given an opportunity to seek court review of any adverse findings. *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986).

Because the hearings provided for by the DNR are ones which meet the description of an adjudicatory hearing, the DNR when issuing an "order" can be said to be an administrative body acting in a judicial capacity.

Consequently, when the DNR makes a determination that a person or entity is unlawfully polluting of the waters of Michigan and so notifies that person or entity, this notice constitutes the commencement of a proceeding before an administrative body acting in a judicial capacity.

However, in the instant case, a hearing has yet to be held. This can be attributed to an agreement reached by Detrex and the DNR at a meeting described by the DNR in their letter to Detrex of November 21, 1985 that Detrex would conduct further investigations. This agreement under *White Lake, supra,* constitutes an "order" which may be attacked in a section 3.528 [M.C.L.A. § 323.8] hearing.

As this order may be attacked by requesting a hearing pursuant to section 3.528 [M.C.L.A. § 323.8], and because the administrator would be acting in a judicial capacity at such a hearing, this satisfies the "suit" requirement. In addition, the factual record showing "stains" on the property of the City of Grand Rapids is sufficient to show the possibility that, in such DNR action, "damages ... on account of property damage" may be shown.[15]

---

**15.** In *Aviex, supra,* the court made the following observation when dealing with whether cleanup costs constitute damages under an insurance policy:

It is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to in-

Hence, Wausau's duty to defend was triggered when Detrex was notified that the DNR had determined that Detrex had violated Michigan law.

### III.

### B.

### (2)

■ Wausau argues that even if this court finds that the Michigan DNR's action constitutes a "suit," Detrex has failed to demonstrate that the factual allegations of the DNR letter raise any possible theory under which Detrex could be provided coverage under the Wausau policies.

The general rule is that "if the allegations of the underlying complaint assert facts which raise the possibility of recovery, however remote, the insurer has an obligation to defend." *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 654 F.Supp. 1334, 1346 (D.D.C. 1986) (IDP). "The link with the indemnification issue, then, is that the burden is on the defendant to demonstrate that there is no possibility of recovery under this policy before they can be relieved of their defence obligation obligation." *Id.*

Thus, this court should grant summary judgment for Detrex if, as to the factual allegations made by the Michigan DNR against Detrex, there is any possible theory under which Detrex could be provided coverage under the Wausau policies.

The property damage, alleged to have occurred at the Gold Shield site, manifested itself as soil stains which DNR personnel discovered on a routine visit to the Gold Shield facility in November 1985. The "stains" were "between the plant building and the nearest rail spur....", in an area owned by the City of Grand Rapids.

Detrex commenced its Gold Shield operation at Grand Rapids in 1966. The Wausau policy for 1966–1967 obligated Wausau under coverage B, "Property Damage Liability"

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to a destruction of property, including the loss of use thereof, caused by accident.

The post–1967 policies provide coverage for property damage "caused by an occurrence." An "occurrence" being defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured,...." Because the property damage became apparent in 1985 and the Wausau policies only were in effect until 1979, an issue arises as to whether there was an "occurrence" within the meaning of the various policy provisions, at the time the policies were in force, which triggers coverage. Detrex stated in its brief of November 24, 1985 that it will later "move this Court for a ruling on the issue the correct trigger of coverage to be applied to the actions." Without waiting, this court must deal with that issue, as it affects the Gold Shield environmental matter.

■ To decide which of the different "trigger of coverage" theories is applicable among those employed by the several states [16] this court, as a federal court sitting in diversity, must look to the conflict-of-laws rules prevailing in Ohio, the state in which this court sits. *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Colonial Refrigerated Transportation, Inc., v. Worsham*, 705 F.2d 821, 825 (6th Cir.1983). "It is well settled in Ohio that in cases involving a contract, the law of the state where the contract is made governs interpretation of the contract." *Nationwide Mutual Insurance Co. v. Fer-*

cur the costs of clean-up itself and then suing plaintiff to recover those costs.
*Aviex,* 336 N.W.2d at 843.
   As the Michigan DNR has the same options in the Gold Shield matter as it did in *Aviex,* this court finds that the costs incurred by Detrex to

evaluate and clean up the soil contamination at its Gold Shield facility constitute damages under the Wausau policy.

**16.** *See e.g. IDP,* at 1341–45.

*rin,* 21 Ohio St.3d 43, 487 N.E.2d 568, 569 (1986).

■■■ The only relevant information provided this court indicates that the policies were executed at Wausau, Wisconsin. Hence, under *Ferrin,* it is determined that the law of Wisconsin applies.

The Seventh Circuit in *Lund v. American Motorists Ins. Co.,* 797 F.2d 544 (7th Cir.1986), drew the following conclusion regarding the Wisconsin rule dealing with "trigger of coverage":

> We find that Wisconsin has adopted the 'negligent act' rule of insurance coverage. Wisconsin courts have found that, in general, the negligent act (such as the negligent design and construction of the roof), as opposed to the resulting damage (the collapse of the roof), triggers coverage under the insurance policy. *Kremers–Urban Company v. American Employers Insurance Company,* 119 Wis. 2d 722, 351 N.W.2d 156 (1984); *Western Casualty & Surety Co. v. Budrus,* 112 Wis.2d 348, 332 N.W.2d 837 (Ct.App. 1983); *Fidelity & Deposit Co. of Maryland v. Verzal,* 121 Wis.2d 517, 361 N.W. 2d 290 (Ct.App.1984).[17]

Detrex has operated the Gold Shield facility since 1966. Upon the present factual record at least two possible sets of circumstances may have led to the alleged property damage. A sudden spill may have caused the pollution of the City's property adjacent to the Detrex operation, or it is possible that this pollution was the result of a slow accumulation of pollutants from the day-to-day operation of the plant. Consequently, the origin of this property damage in 1985, as evidenced by the "stains,"

has not yet been determined. The continued investigation of this site by the DNR could produce evidence that demonstrates that the damage has occurred from long-term exposure dating back to the years in which Wausau provided policy coverage.

As there is a possibility that the property damage alleged by the DNR occurred during the Wausau policies' coverage, Wausau has a duty to defend Detrex in this action until Wausau can prove otherwise.[18]

### III.

### B.

### (3)

■■■ As this court has concluded that there is a possible "occurrence" during the period of time in which the Wausau policies were in effect, it must now turn to whether Wausau has shown that a policy exclusion conclusively excludes Detrex's possible basis for recovery under the policy. *See supra, IDP,* at 1345–46.

Wausau concedes that its pre–1971 policies do not contain a pollution exclusion; however, the post–1971 pollution exclusion states as follows:

> This insurance does not apply:
>
> (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such dis-

---

**17.** The Seventh Circuit in *Lund* noted that under Wisconsin law the

"terms 'occurrence' and 'accident' are synonymous in the context of liability insurance." *Id.* at 547, *citing, Welter v. Singer,* 126 Wis.2d 242, 376 N.W.2d 84 (Ct.App.1985). The *Welter* court cited the Wisconsin Supreme Court case *Olsen v. Moore,* 56 Wis.2d 340, 202 N.W.2d 236 (1972) for this proposition. The *Olsen* court defined "occurrence" as "a fortuitous event, unforseen by the [defendant]."

**18.** The *City of Milwaukee* court, in applying a pollution exclusion identical to that of the instant case, found:

In spite of the cities' contention that any sudden runoffs that may have occurred were sudden and accidental, the record and common sense stand in firm refutation of the validity of such a conclusion. The uncontroverted expert testimony establishes that in order for the damage to have been created by the acid levels which existed, the sewers had to have been subject to the acid for a period of from two to ten years. When this is considered together with Allied's normal [24°] workday, it provides more than adequate grounds to reject the cities contention.

charge, dispersal, release or escape is sudden and accidental.

According to Wausau, the pollution complained of by the DNR was not "sudden and accidental," but was the result of intentional acts committed over an extended period of time with an intention that pollution occur.

However, in the affidavit of Robert Jones, an employee of Detrex since February 5, 1951; Vice President of Detrex since February 1, 1974, he stated:

Detrex never intended to cause any environmental damage through its activities.

Jones went on to point out that the facility which was the subject of the Gold Shield action, was "operated in compliance with [its] ... permit."

As Detrex was operating this facility under a permit, and thus met the requirements of the State of Michigan for such operations, it can be concluded that any resultant pollution could only be as much a surprise to Detrex as it was to the DNR, and was not the result of any conduct on behalf of Detrex engaged in with the intention to pollute. *See* e.g. *Kremers–Urban Co. v. American Employers Ins.*, 119 Wis. 2d 722, 351 N.W.2d 156, 166 (1984) (coverage provided for unintended results of intentional act); *see also Buckeye Union Ins. v. Liberty Solvents and Chemicals Co., Inc.*, 17 Ohio App.3d 127, 477 N.E.2d 1227, 1234–35 (Ohio App.1984); *Putnam v. Zeluff*, 372 Mich. 553, 127 N.W.2d 374, 376 (1964).

However, the phrase "sudden and accidental" does not include injuries incurred over a period of time. *City of Milwaukee v. Allied Smelting Corp.*, 117 Wis.2d 377, 344 N.W.2d 523 (Wis.App.1983).

When a condition is caused by accident, our Supreme Court has limited coverage to: " 'injuries caused by a sudden and

identifiable event with respect to both location and time. This is intended to rule out exposure injuries, incurred over a period of time, such as the harmful effects of obnoxious fumes, stream pollution, vibration or noises.' " *See Clark v. London & Lancashire Indemnity Co. of America*, 21 Wis.2d 268, 283, 124 N.W.2d 29, 36–37 (1963).[19]

Nevertheless, as one of the possible sets of circumstances through which the alleged property damage could have occurred was a sudden and accidental spill, the pollution exclusion does not preclude this theory of coverage alleged by Detrex.

In addition, the Wausau policies which covered the Detrex facility's operations from 1966 to 1971 do not contain a pollution exclusion. If the alleged property damage was the result of a long-term accumulation of contaminants, there exists the possibility that some of this alleged contamination could have occurred in the years 1966 to 1971. Until Wausau can establish that each of the possible theories of recovery under the policies are excluded, Wausau has a duty to defend in the Michigan DNR's proceedings against Detrex dealing with the Gold Shield site.

### III.

### B.

### (4)

Wausau alleges that Detrex failed to give Wausau timely notice of an "occurrence" at the Gold Shield site or the claims made by the DNR.

The "stains" on the soil surface were discovered by the DNR on a routine visit in November 1985. At the request of the DNR, Detrex's facility excavated a trench from which the DNR retrieved soil samples

---

**19.** Detrex has no duty to conclusively prove that the property damage alleged by the DNR was caused by Detrex, or to conclusively prove that the property damage occurred at a specific time as the result of a specific incident.

There is no reason why the insured, whose insurer is obligated by the contract to defend him, should have to try the facts in a suit against his insurer in order to obtain a de-

fense. The whole point to the insurance coverage duty to defend is to afford insureds some security and peace of mind when suits such as these are brought. If the allegations of the underlying complaint assert facts which raise the possibility of recovery, however remote, the insurer has an obligation to defend.

*IDP* at 1346.

in early November 1985. On November 14, 1985, Detrex notified Wausau that it had been requested to conduct an excavation by the DNR in order for the DNR to conduct an analysis. The letter further stated:

We are interacting with the DNR on a continuing basis in order to comply with their request to determine the extent of any possible ground contamination along the east side of the said building.

It wasn't until November 21, 1985, that the DNR notified Detrex that the soil was contaminated and that Detrex was in violation, thereby, of Michigan law. This sequence of events conclusively demonstrates that Wausau received reasonable notice of the DNR's action taken at the Gold Shield site.

Moveover, Detrex was operating under a permit issued by the State of Michigan. Detrex had no reason to believe that its activities were causing soil contamination prior to November 11, 1985.

### III.

### C.

■ In this declaratory judgment action, Detrex also requests that this court find that Wausau has a duty to defend and indemnify Detrex in a suit entitled *National Mico-Dynamics, Inc. v. Lutex Chemical Corp.*, No. 64645 (Chancery Ct., Hamilton Cty., Tenn.). Detrex has made a partial summary judgment motion dealing solely with the duty to defend.

The *National Micro-Dynamics* suit involves the Lutex Chemical Co. (Lutex) which operated a plant in Chattanooga, Tennessee. This plant manufactured dying agents and chemical compounds for the textile industry and allegedly discharged hazardous substances on its property.

In July 1968, Detrex purchased all of the outstanding capital stock of Lutex. However, Lutex continued to operate as a separate corporation. In 1972, Detrex sold the Lutex stock to National Starch and Chemical Corporation who then, in 1978, sold the real property associated with Lutex. National Micro-Dynamics, Inc. (NMDI) eventually purchased the property on October 1, 1983.

According to the complaint in *National Micro-Dynamics,* NMDI suffered property damage "directly and solely by the past depositing and dispersal of hazardous chemicals." As a result of Lutex's alleged disposal of allegedly hazardous substances from 1964 until 1972, and Detrex's acquisition of Lutex in 1968, NMDI alleges in its complaint that Detrex is liable, either in part or in whole, to reimburse NMDI for its alleged property damage.

The insurance policies issued by Wausau to Detrex were renewed on a yearly basis. It is apparent that from January 1, 1970 through January 1, 1974, Wausau did not provide any insurance for Lutex. In each of the four insurance policies issued during this period, there was an endorsement specifically excluding any coverage for the operation of Lutex.

A review of the two insurance policies covering the period of time from January 1, 1968 to January 1, 1970 fails to find any listing of Lutex as an additional insured, or any inference to any coverage of any operation of Lutex.

In these two policies the named insured is defined as

The person or organization named in Item 1. of the declarations of this policy.

The named insured is listed as "Detrex Chemical Industries." The hazard described on the schedule for named insured Detrex is "Premises—Operations." Thus, Detrex is insured only for its own plants and operations and those of its listed divisions. This coverage does not extend to Lutex, a separate corporation, absent a specific listing coupled with an additional premium charge in accordance with the following definition of the scope of coverage:

### COVERAGES

The insurance afforded by this policy is only with respect to such coverages as are indicated by specific premium charges or charges in the appropriate coverage ... Schedules of the covered parts attached to and hereby made a part of this policy.

The schedules attached to these two policies correspond to the premises and operations of Detrex and the various companies listed as additional insureds on these policies. There is no schedule for Lutex, nor are any operations at the Lutex location listed.

Detrex has failed to come forward with any argument or any evidence from which this court could find that Lutex was covered under the Wausau policies. Thus, this court concludes that (1) Wausau has no duty to defend in the *Micro–Dynamics* suit; (2) Wausau has no duty to indemnify Detrex should Detrex be found liable in that action.

### IV.

The plaintiff's motion for summary judgment has been directed solely to the first count of its complaint. The second count has not been the subject of this motion.

Upon the grounds and for the reasons heretofore stated, (1) the plaintiff's summary judgment motion is granted with respect to the Gold Shield site, *supra* part III.B. (1) at page 34; and, (2) subject to the determinations and declarations that conclude part II.B. at page 20, the plaintiff's motion for summary judgment is denied as to the remaining environmental matters.

IT IS SO ORDERED.

### MEMORANDUM AND ORDER

### ON MOTION FOR PARTIAL RECONSIDERATION

Plaintiff Detrex moves for partial reconsideration of the Court's memorandum and order filed August 27, 1987 (hereafter "Memorandum and Order"). In its briefs, Detrex argues that this Court "incorrectly provided Wausau with the benefit of an ambiguity which Wausau's policy created." This is a misreading of the Court's language on page 7 of the Memorandum and Order. After quoting the insuring language, it was noted Wausau's policies obligated Wausau to "defend any suit against [Detrex] seeking damages on account of such bodily injury or property damage," and this is true "even if any of the allega-

tions of the suit are groundless, false or fraudulent...." The Court then stated:

> The insurance policies do not define the term "suit," and standing alone the meaning of "suit" may be somewhat ambiguous.

It is evident the plaintiff Detrex isolates this sentence to support the above quoted argument. However, the next sentence makes it plain that the word "suit" may not be construed "standing alone." The Court stated:

> Nevertheless, the insuring language, just quoted, helps to mark out the meaning of "suit" as used. Thus, "allegations of the suit" indicate that a "suit" is composed of "allegations."

Then this Court reaches its conclusion:

> This implies that the traditional meaning of "suit" is intended, i.e., that it contains allegations which seek "damages" on account of either "personal injury" or "property damage." (footnote omitted)

Considering all six sentences together, it is evident that plaintiff has plucked out of that integrated context a single sentence to support its argument that this Court "provided Wausau with the benefit of an ambiguity which Wausau's policy created." Moreover, the six sentences must be read consecutively, and only the last of those six sentences represents the Court's conclusion. The Court concluded that "the traditional meaning of 'suit' is intended, i.e. that it contains allegations which seek 'damages' on account of either 'personal injury' or 'property damage,'" *supra* at 442.

The plaintiff further argues that under this Court's "current decision" Detrex is "left with a Hobson's choice: if Detrex resolves an environmental matter at the administrative level, avoiding protracted litigation, Wausau undoubtedly would argue that there is no coverage." However, marking out policy coverage should turn on a reasonable construction of the word "suit" in the policy's insuring language, and not on an assured's decision as to whether or not it is advantageous to settle a "claim" before litigation has begun. Thus, this Court's Memorandum and Order,

at page 10, cited two cases in which an insured's decision to settle an outstanding claim before suit was filed, nevertheless resulted in denial of the insured's reimbursement for defense costs. *Fisher v. Hartford,* 329 F.2d 352 (7th Cir.1964) and *Marvel Heat Corp. v. Travelers Indemnity Co.,* 325 Mass. 682, 92 N.E.2d 233 (1950).

Judge Feikens states in his memorandum and order in *Firemen's Fund Insurance Co. v. EX–CELL–O Corp.,* 682 F.Supp. 34 (E.D.Mich.1987):

> [W]hile there are disparate judicial approaches to the definition of a "suit", the definition that the insurers urge would provide an incentive for policyholders to ignore agency requests and force court actions against them so as to prompt their insurer's(s') duty to defend.

 The law's policy of fostering settlement of legal disputes and avoiding costly litigation gives background appeal to Judge Feikens' statement. Yet I remain unpersuaded, upon reconsideration, as Detrex has re-asserted, that Wausau's "duty to defend any suit" brought against Detrex is triggered by the "PRP demand letters." Moreover, this Court reaffirms its conclusion that "the PRP letters, taken together with the [unadopted] Record of Decision and its attachments, constitute a claim against Detrex under the insuring language of the insurance policies;" but that "a claim for damages made against Detrex that might result in its legal liability is not synonymous with a 'suit' so as to trigger Wausau's duty to defend Detrex under their insurance policies."

Nevertheless, the law's policy to favor settlements and to avoid litigation persuades this Court, in the context of CERCLA, that its previous Memorandum and Order is too restrictive in concluding and declaring:

> Until, pursuant to Section 9606, the EPA resorts to a court injunction or to a mandatory court order to enforce a section 9606(a) administrative order, or pursuant to section 9607 the EPA, in district court, seeks cleanup costs, a "suit" would not

be brought against Detrex that would trigger Wausau's duty to defend.

Accordingly, it is concluded that in the *Fields Brook* environmental matter, and in any of the other environmental matters, Wausau's "duty to defend" would be triggered "at the administrative level," should the United States Environmental Protection Agency issue a remedial order to Detrex pursuant to Section 9604 or 9606 of CERCLA.

This modification of the Memorandum and Order is consistent with this Court's ruling in the Gold Shield Site environmental matter, III B(1) of this Court's Memorandum and Order.

In this respect, the motion for reconsideration is granted, and the Memorandum and Order is modified. In all other respects, the motion for reconsideration and for a partial summary judgment is overruled.

IT IS SO ORDERED.