**A. JOHNSON & CO., INC. and A. Johnson Energy Marketing, Inc., Plaintiffs,**

v.

**The AETNA CASUALTY AND SURETY COMPANY, Defendant.**

**Civ. A. No. 86–3305–WD.**

United States District Court,
D. Massachusetts.

June 29, 1990.

Robert L. Ciociola, Weiss, Angoff, Coltin, Kosky & Wolf, Boston, Mass., for plaintiffs.

Dennis G. Jacobs, Simpson Thacher & Bartlett, New York City, Bernard J. Bonn, III, David J. Byer, Testa, Hurwitz & Thi-

beault, Boston, Mass., for Travelers Ins. Co.

Mudge, Rose, Guthrie, Alexander and Ferdon, New York City, David B. Chaffin, Wickens, Hare, Koches & Cale, Thomas F. Holt, Jr., DiCara, Selig, Sawyer & Holt, Boston, Mass., for Ins. Co. of North America.

John P. Graceffa, Garrett Harris, John Curran, Gallagher and Gallagher, Boston, Mass., for Aetna Cas. and Surety Co.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

This declaratory judgment action raises issues regarding an insurer's (1) responsibility to indemnify for costs arising out of a hazardous waste cleanup and (2) duty to defend its insured during the dispute related to that cleanup. Plaintiffs A. Johnson & Co., Inc. and its subsidiary A. Johnson Energy Marketing, Inc. (collectively "Johnson") incurred substantial costs in connection with the cleanup of a hazardous waste site in Maine. The only remaining defendant—the Aetna Casualty and Surety Company ("the Aetna")—provided comprehensive general liability coverage for Johnson. At issue on cross-motions for summary judgment is the extent, if any, of the Aetna's obligation to Johnson under the insurance policies implicated by that cleanup.

### I

The case has its origins in the contamination of a parcel of land in Gray, Maine, that had been the site of a waste disposal facility operated by Richard Dingwell, d/b/a the McKin Company ("McKin Site" or "Site"). Dingwell operated the McKin Site from approximately 1965 through 1978, when State of Maine authorities closed it. Three corporate predecessors of Johnson generated hazardous waste in New Hampshire which was disposed of at the McKin Site in Maine. They were consequently designated Potentially Responsible Parties ("PRPs") by Federal and State of Maine environmental authorities.

After lengthy negotiations among the United States, the State of Maine and the PRPs, the United States and the State of Maine filed a complaint in the United States District Court for the District of Maine on May 5, 1988, seeking

> injunctive relief to abate an imminent and substantial endangerment to the public health, welfare or the environment presented by the [McKin Site]; and recovery of costs incurred by the United States and the State of Maine in connection with response actions at the facility.

D.Me. Complaint at ¶ 1. That Complaint did not seek "natural resource damages."

The action in the District of Maine was formally resolved on November 2, 1988, when a consent decree was entered obligating Johnson and other PRPs to pay the past and future cleanup costs of the McKin Site. The consent decree contained a covenant by the United States and the State of Maine not to sue for "natural resource damages arising out of the conditions at or originating from the McKin Site." Consent Decree at ¶¶ 47 and 48. In the instant action, Johnson seeks reimbursement from the Aetna for its expenditures and legal fees in connection with the McKin Site cleanup dispute.

### II

#### Choice of Law

■ At the outset, the case presents a choice of law problem because the insurance policies at issue contained no choice of law provision. In this diversity action, I must apply the choice of law rules of Massachusetts as the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Massachusetts has rejected a rigid choice of law approach "in favor of the more flexible, multiple-factor, 'interest analysis' or 'most significant relationship' analysis exemplified by the *Restatement (Second) of Conflict of Laws* (1971)." *Bi–Rite Enterprises, Inc. v. Bruce Miner Co.*, 757 F.2d 440, 442 (1st Cir.1985). In other words, Massachusetts has adopted a "functional choice of law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Bush-*

*kin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662 (1985).

■ This interest-analysis approach led the parties to different conclusions. Johnson initially contended that Maine law should apply, or in the alternative, the law of New Hampshire. Faced with new decisional law, Johnson now contends that some sort of federal common law of environmental insurance coverage should apply. The Aetna, by contrast, initially argued for the application of North Carolina law, or in the alternative, the law of New Hampshire. Given recent case law developments, the Aetna is now satisfied with the application of Maine law.[1] The parties' choice of law contentions are—as their recent changes of position illustrate—fundamentally result oriented. Lacking agreement of the parties, I turn to a discussion of the *Second Restatement* principles, as required by the Massachusetts choice of law approach, to determine which state[2] law should apply.

■ Two provisions of the *Second Restatement* are particularly relevant: § 193 and § 6.[3] As will be seen, both sections lead to the conclusion that the substantive law of Maine—the state of disposal—governs this dispute.

Under § 193, an insurance policy is governed by the law of the state which was to be the principal location of the insured risk ... unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties.

Defining the principal location of the insured risk is not a matter of superficial review. "[O]nly by close study of the context, if then, can one ascertain the precise sense in which [the term risk] is used." R. KEETON, INSURANCE LAW 4 (1971). In disputes concerning hazardous waste, the location of the risk can be seen as the state of generation—here New Hampshire, where the risk began by the generation of the waste—or the state of disposal—here Maine, where the risk was realized. An insured risk "has its principal location, in the sense here used, in the state where it will be during at least the major portion of the insurance period." *Second Restatement* § 193 comment b (1971).

The commentary to § 193 allows for some flexibility in identifying the location of an insured risk. Thus, "[t]he location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state. Situations where this cannot be done, and where

1. Ironically, while this case was under advisement, the law of Maine, to which Johnson principally looked for favorable authority, turned in part against Johnson's position, and the law of North Carolina, to which the Aetna principally looked for support, turned in part against the Aetna's position. *See* Note 6 *infra* and accompanying text.

2. The plaintiffs' new-found interest in a federal common law of environmental insurance coverage lacks merit. While environmental matters implicate broad national concerns, there is no authority for creating a federal common law of environmental insurance coverage in this context. The Supreme Judicial Court of Massachusetts, whose choice of law principles govern, recently restated the settled understanding regarding environmental coverage disputes: "The question is one of State law." *Hazen Paper Company v. United States Fidelity and Guaranty Co.*, 407 Mass. 689, 699, 555 N.E.2d 576 (1990).

3. A third provision, § 188, applicable to contracts generally, sets forth a basic framework for consideration of the choice of law question. It provides in relevant part:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) ... [T]he contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

    (a) the place of contracting,

    (b) the place of negotiation of the contract,

    (c) the place of performance,

    (d) the location of the subject matter of the contract, and

    (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

location of the risk has less significance, include ... where the policy covers a group of risks that are scattered throughout two or more states." *Id.*

For purposes of § 193, then, the location of the insured risk can be approached from two perspectives. On the one hand, a relatively arbitrary choice between the competing claims of New Hampshire and Maine for designation as the location of the insured risk can be made and § 193 significance assigned to that state. If forced to make that choice, I would choose Maine.

On the other hand, because the risk at issue here was to some degree transient, a more extended analysis pursuant to § 6(2) is appropriate to determine whether, apart from or in addition to § 193 significance, Maine or New Hampshire[4] has a more significant relationship to the transaction and parties.

Maine is the jurisdiction having the most significant relationship to the insurance dispute at issue here under § 6(2). Section 6(2) provides that:

[T]he factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

As the site of the toxic waste disposal, Maine has the single most important connection to the core issues of the case; it surely has the strongest interest in how Johnson's policies are interpreted because resolution of these issues will determine how pollution clean-up in Maine will be financed. § 6(2)(b) & (c).

The choice of Maine as the jurisdiction whose law will be applied also serves a basic policy purpose of environmental law. The issues of environmental cleanup, while matters of national concern, are intensely local in impact. As will be seen below, different jurisdictions have taken different views with respect to the availability of insurance for clean-up activities. Those views are presumably reflections of the considered manner in which the individual states impacted by an environmental problem choose to allocate costs. The basic policies underlying the developing law of environmental remedy strongly support making the site of the alleged damage the governing jurisdiction for choice of law purposes. § 6(2)(a) & (e).

Moreover, the justified expectations of the parties to the insurance contract, in this particular area,[5] suggest that the jurisdic-

---

**4.** North Carolina is not a viable candidate in this context. The only significant connection of North Carolina to the dispute here is that the policies were negotiated and executed there.

Under the old doctrine of *lex loci contractu*, the fact that the insurance contracts were negotiated and executed in North Carolina may have decided the issue, but it is insufficient to control the multi-factor interest analysis of the *Second Restatement.*

I recognize, however, that the Massachusetts Supreme Judicial Court recently endorsed a *lex loci contractu* approach to choice of law for an insurance coverage dispute arising from a conglomerate's request for "declaratory and monetary relief against [the more than 200] insurance companies that provided it with comprehensive general liability insurance for approximately three decades." *United Technologies Corp. v. Liberty Mutual Ins. Co.,* 407 Mass. 591, 593, 555

N.E.2d 224 (1990). The Court noted that "[c]laims have been made or are threatened against UTC with respect to the pollution of approximately seventy sites in more than twenty States." *Id.* at 593–94, 555 N.E.2d 224. In that context, the Court expressed "doubt that the law of the States in which the pollution sites lie will severally govern questions of policy coverage." *Id.* at 597, 555 N.E.2d 224 (footnote omitted). Interest analysis in the context of a complex multilateral dispute where the risks cannot "be located, at least principally, in a single state," *Second Restatement* § 193 comment b, differs materially from that analysis in a case such as this where the risk can be located principally in a single state.

**5.** Of course, it is somewhat artificial to speak of the expectations of the parties in dealing with insurance for pollution occurring in 1974

tion of impact should govern the choice of law issue. Maine has already applied Maine law to the insurance contract for the owner of the McKin Site, albeit without evaluation of choice of law considerations; *see generally Travelers Indemnity Co. v. Dingwell,* 414 A.2d 220 (Me.1980). Uniformity of result is an aspect of justified expectations which is honored by the application of Maine law to the other parties responsible for pollution at the McKin Site. § 6(2)(d) & (f).

The law of the state of disposal seems as a general proposition the appropriate law to apply when construing an insurance policy whose coverage is implicated by disposal at a single site. *Cf. Jones Truck Lines v. Transport Ins. Co.,* 29 ERC 1606, 1609–10, 1989 WL 49517 (E.D.Pa.1989); *Triangle Publications, Inc. v. Liberty Mut. Ins. Co.,* 703 F.Supp. 367, 370 (E.D.Pa.1989); *Travelers Indem. Co. v. Allied–Signal, Inc.,* 718 F.Supp. 1252, 1254 (D.Md.1989); *Independent Petrochemical Corp. v. Aetna Cas. & Surety Co.,* 654 F.Supp. 1334, 1356 (D.D.C. 1986). *See also Lido Company of New England, Inc. v. Fireman's Fund Ins. Co.,* 574 A.2d 299, 300 (Me.1990) (applying—by agreement of the parties—New Hampshire law to an insurance dispute involving cleanup of a New Hampshire site); *but see United Technologies Corp. v. Liberty Mutual Ins. Co.,* 407 Mass. 591, 597, 555 N.E.2d 224 (1990) (expressing doubt about choice of law of state of disposal law in context of complex multi-state multi-site dispute). The law of the state of disposal is clearly appropriate here under § 6 and § 193.

Accordingly, I will interpret the Aetna policies at issue in this case in accordance with Maine law.

III

*Maine Law Applied*

The Supreme Judicial Court of Maine has recently addressed and resolved the substantive issues presented by these motions. Choosing to style its role as "simply to determine the meaning of a private contract between the[ ] parties, not to foster or retard environmental goals," *Patrons Oxford Mutual Insurance Co. v. Marois,* 573 A.2d 16, 17 (Me.1990), the Law Court allied itself with those jurisdictions which have found that the insurer has no duty to indemnify or defend in environmental disputes such as this.

Before turning to the implications of *Marois* for this case, the Law Court's delphic explanation of the role of a court applying Maine law in this context bears some explication. Commentators have identified as particularly pronounced in the environmental area the fashioning of "judge-made insurance," a trend characterized by "[j]udicial decisions in a number of environmental liability insurance disputes ... [that] have created coverage even in the face of contrary policy language." Abraham, *Environmental Liability and the Limits of Insurance,* 88 Colum.L.Rev. 942, 960–61 (1988). *See also* Note, *The Pollution Exclusion Clause Through the Looking Glass,* 74 Geo.L.J. 1237 (1986); Chesler, Rodburg & Smith, *Patterns of Judicial Interpretation of Insurance Coverage for Hazardous Waste Liability,* 18 Rutgers L.J. 9 (1986); Freeman, *Tort Law Reform: Superfund/RCRA Liability as a Major Cause of the Insurance Crisis,* 21 Tort & Ins.L.J. 517 (1986).

What appears to have animated the development of judge-made insurance in the environmental area is the desire to spread

through 1978, when the contracts at issue here were written. Only by an imaginative leap can one project expectations with respect to pollution issues as insurers and insureds negotiated their comprehensive general liability policies at that time.

Nevertheless, assuming some recognition of the nature of the risks, the intelligent underwriter would direct his attention to the place of disposal in evaluating a policy proposal. The mere generation of hazardous waste is not a

concern of environmental law in this context; it is the threat of release or disposal of the waste which poses the risk. Thus, insurers would be directing their attention to the place of disposal as the location of the risk for which insurance was being offered.

For their part, insureds would be attending to the quality of disposal at a particular site because of their awareness that substantial—even joint and several—liability awaits those generators whose waste is disposed improperly.

the very substantial costs of environmental clean-up. This development has had an unintended consequence: the virtual disappearance of environmental liability coverage in part because the potential for broad judicial interpretation has made the scope of the risks for writing such insurance unknown and unknowable. *See generally,* Abraham, *Environmental Liability and the Limits of Insurance,* 88 Colum.L.Rev. at 944 nn. 7 & 8 and accompanying text. The Law Court's desire "simply to determine the meaning of a private contract" rather than to influence environmental goals appears to reflect a considered judgment not to be drawn into an affirmative judicial policy-making role under the rubric of insurance contract interpretation.

The implications of *Marois* must be addressed within this framework of a consciously restrained judicial approach to insurance disputes in the environmental area.

–A–

Indemnity

■ The Aetna's Comprehensive General Liability policy ("CGL") obligates the Aetna to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage ... caused by an occurrence." CGL at F–11. Except for a small sum paid to neighbors of the McKin Site, and a larger sum directed toward reimbursement of government administrative costs, all of the monies expended by Johnson were spent on actual clean-up of the site. *See* Winger Affidavit ¶¶ 4–12. Aetna argues that these cleanup costs are equitable in nature and therefore do not constitute "damages" within the meaning of the CGL.

Courts are divided on the question of whether cleanup costs constitute damages. *Compare, e.g., Hazen Paper Co. v. United States Fidelity & Guaranty Co.,* 407 Mass. 689, 555 N.E.2d 576 (1990); *Avondale Industries, Inc. v. Travelers Indem. Co.,* 887 F.2d 1200 (2d Cir.1989) *rehearing denied* 894 F.2d 498 (2d Cir.), *cert. denied* — U.S. 12, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *Intel Corp. v. Hartford Acc.*

*and Indem. Co.,* 692 F.Supp. 1171, 1186–93 (N.D.Cal.1988); *Centennial Ins. Co. v. Lumbermens Mutual Casualty Co.,* 677 F.Supp. 342, 349–50 (E.D.Pa.1987); *New Castle County v. Hartford Acc. and Indem. Co.,* 673 F.Supp. 1359, 1364–66 (D.Del.1987) (cleanup costs are "damages"), *with, e.g., Cincinnati Ins. Co. v. Milliken & Co.,* 857 F.2d 979 (4th Cir.1988); *Continental Ins. Co. v. Northeastern Pharm. & Chem. Co.,* 842 F.2d 977, 985–87 (8th Cir.) (en banc), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (*"NEPACCO"*); *Maryland Cas. Co. v. Armco, Inc.,* 822 F.2d 1348, 1351–54 (4th Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988) (cleanup costs are not "damages").

*Marois,* construing identical language, aligned the law of Maine with the latter—apparently minority, Faron, *Self Insurers and Risk Managers,* 25 Tort & Ins.L.J. 431, 438–39 (1990)—view, holding that cleanup costs do not constitute damages. The Law Court drew a distinction between monies expended to provide and execute a remedial plan satisfactory to the Maine environmental agency and actual property damage to other property owners. The *Marois* court recognized that the remedial monies

> may be substantial and may effectively alleviate or prevent property damage to others, but we do not believe the "ordinarily intelligent insured," engaged in a "more than casual reading of the policy," *Union Mutual Fire Ins. Co. v. Commercial Union Ins. Co.,* 521 A.2d 308, 310 (Me.1987), would consider them to be "sums which the insured [is] legally obligated to pay as damages." Instead, they are the expenses the Maroises may be required to incur to halt continuing pollution and property damage. There may be a substantial difference between these remedial costs and the amount of damages the Maroises would have to pay to property owners for damages to their property. It is the latter expenditure upon which the parties have contracted and upon which the insurance premium is based.

*Patrons Oxford Mutual Insurance Co. v. Marois,* 573 A.2d at 18–19 (footnote omitted).[6]

Consequently, of all the costs detailed in the Winger Affidavit, only $271.03 allocable to settlement of "the claims of the Humphrey's, neighbors of the McKin Site," Winger Aff. at ¶ 5, might properly be deemed damages under the policy.

The Johnson plaintiffs suggest that references to natural resource damages in the consent decree provide a basis for finding compensable damage claims.[7] However, Johnson's instant complaint refers only to "clean-up and oversight costs," *see, e.g.,* D.Mass. Complaint ¶ 33, not to natural resource damages. Moreover, the Winger affidavit does not support the suggestion that natural resource damages have been incurred. According to Winger, "of Plaintiff's total McKin Site contributions of $514,395.51, the amount spent on actual clean-up work was $473,567.18, and the amount spent on administrative costs or other matters [apparently only the Humphrey settlement] was $40,828.33." None of these sums can be said to involve natural resource damages. Thus, on the record before me, none of the monies paid by Johnson may be treated as damages pursuant to Maine law with the exception of the *de minimis* Humphrey settlement sum.

The parties appear to agree that there is no deductible in the Aetna's policies at issue. Consequently, I must consider whether the *de minimis* Humphrey settlement amount may be indemnified under the policy. The Aetna contends that the so-called "pollution exclusion" bars such indemnity. The parties agree that the clause at issue here provides that the policy does not apply:

> to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any course or body of water, *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

(emphasis supplied).

Apparently, Maine has not given a definitive reading to this type of exclusion clause. However, despite the insurer's argument that a pollution exclusion clause identical to that involved here precluded such a duty, the Law Court did impose a duty to defend on the insurer of the operator of the McKin site, at least until the facts regarding the nature of release were more fully developed. *Travelers Indemnity Co. v. Dingwell,* 414 A.2d at 224–227.

▮ Nevertheless, in light of the consciously restrained manner in which the Law Court now approaches the issue of environmental insurance coverage, I am satisfied that, once definitively stated, Maine law on the subject of this old[8] pollution exclusion clause will join the "emerging nationwide judicial consensus that the 'pollution exclusion' clause is unambiguous and that an insured who is accused of

---

6. The Law Court has recently expressed its view that the highest court of New Hampshire would likewise decline to order an insurer to pay cleanup costs as "damages" pursuant to a virtually identical general liability policy. *Lido Company of New England, Inc. v. Fireman's Fund Ins. Co.,* 574 A.2d 299 (Me.1990). By contrast, North Carolina's highest court has concluded that cleanup costs are damages. *C.D. Spangler Construction Co. v. Industrial Crankshaft and Engineering Co., Inc.,* 326 N.C. 133, 388 S.E.2d 557 (1990).

7. It appears that the references to natural resource damages in the Consent Decree at ¶¶ 14 and 15 are merely meant as a recitation of consideration for the covenant not to sue set forth in ¶¶ 46 and 47.

8. The form pollution exclusion clause at issue here was replaced in later policies by eliminating the exception for "sudden and accidental" releases. The new form pollution exclusion was apparently designed to eliminate any uncertainty about exclusion of coverage even for accidental pollution. Judge Carter has interpreted this new clause, as a matter of Maine law, to effect such an absolute pollution exclusion. *Guilford Industries, Inc. v. Liberty Mutual Insurance Co.,* 688 F.Supp. 792 (D.Me.1988), *aff'd without op.,* 879 F.2d 853 (1st Cir.1989) (holding accidental rupture of insureds' oil tanks during a flood subject to pollution exclusion clause).

causing injury or property damage by the intentional discharge of pollutants over an extended period of time is bound by the terms of the exclusion and is not entitled to be defended or indemnified by its insurer." *Technicon Electronics Corp. v. American Home Assur. Co.,* 141 A.D.2d 124, 533 N.Y. S.2d 91, 96 (1988).[9]

The Supreme Judicial Court of Massachusetts is the latest court to give voice to this consensus. In *Lumbermen's Mutual Casualty Co., Inc. v. Belleville Industries, Inc.,* 407 Mass. 675, 555 N.E.2d 568 (1990), the SJC held that "[i]f the word 'sudden' is to have any meaning or value in the exception to the pollution exclusion clause, only an abrupt discharge or release of pollutants falls within the exception." *Id.* at 681, 555 N.E.2d 568. The Supreme Judicial Court of Maine, I believe, is likely to reach a similar conclusion, finding the views expressed by the Massachusetts Supreme Judicial Court persuasive.[10]

The burden of establishing that the occurrence giving rise to the Humphrey settlement comes within the "sudden and accidental" exception to the pollution exclusion rests with the plaintiffs. *See, e.g., Fireman's Fund Insurance Cos. v. Ex–Cell–O,* 702 F.Supp. 1317, 1328 (E.D.Mich.1988), *reconsideration denied,* 720 F.Supp. 597 (E.D.Mich.1989); *Fischer & Porter Co. v. Liberty Mutual Insurance Co.,* 656 F.Supp. 132, 140 (E.D.Pa.1986); 19 G. COUCH, COUCH ON INSURANCE § 79:385 (2d ed. 1983). The plaintiffs have not shown that they can meet that burden here.

Nothing in the record suggests that the releases which gave rise to the Humphrey damage settlement were either "sudden or accidental." Focusing solely on the "sudden" dimension, it is apparent that Johnson itself views the relevant events to have concerned gradual occurrences. Thus, in the complaint in this case, Johnson refers to the allegation "that certain materials disposed of at the McKin Site *leached* or *seeped* through the land and ground water at the McKin Site and entered the water supply system of Gray Maine." D.Mass. Complaint at ¶ 26 (emphasis supplied). The District of Maine Complaint of the United States and the State of Maine similarly uses language denoting a gradual occurrence to describe the cause of damage. For example, that complaint alleges that the releases of "dangerous substances resulting from defendants' activities ... have contaminated surface and subsurface soils and surface waters at the [McKin Site] and groundwater onsite and offsite. The *migration* in groundwater of some of those dangerous substances has reached private domestic water supply wells." D.Me. Complaint at ¶ 8 (emphasis supplied). In short, there has not been alleged, let alone established, any "abrupt" event sufficient to permit Johnson to rely upon the "sudden and accidental" exception to the pollution exclusion clause.

Accordingly, under Maine law, the Aetna is not obligated to cover Johnson for any costs incurred to date in connection with the McKin Site.

–B–

Duty to Defend

The CGL obligates the insurer "to defend any suit against the insured seeking dam-

9. Indeed, even Massachusetts and North Carolina, which have taken a more expansive view of environmental coverage than Maine by holding that clean-up costs constitute damages, *Hazen Paper Co. v. United States Fidelity & Guaranty Co.,* 407 Mass. 689, 555 N.E.2d 576 (1990); *C.D. Spangler Construction Co. v. Industrial Crankshaft and Engineering Co., Inc.,* 326 N.C. 133, 388 S.E.2d 557 (1990), nevertheless do not take an expansive view of the "sudden and accidental" exception to the pollution exclusion. *Lumbermen's Mutual Casualty Co., Inc. v. Belleville Industries, Inc.,* 407 Mass. 675, 555 N.E.2d 568 (1990); *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.,* 315 N.C. 688, 340 S.E.2d 374, *rehearing denied* 316 N.C. 386, 346 S.E.2d 134 (1986).

10. The plaintiffs themselves looked to Massachusetts precedent on the meaning of "sudden and accidental" in their argument that the pollution exclusion was inapplicable. That precedent—the Appeals Court decision in *Shapiro v. Public Service Mutual Insurance Co.,* 19 Mass. App.Ct. 648, 651–52, 477 N.E.2d 146 (1985)—was expressly rejected by the Supreme Judicial Court in *Belleville Industries,* 407 Mass. at 682, 555 N.E.2d 568.

ages." The Aetna maintains that no duty to defend has ever arisen in this case, because no lawsuit seeking damages was ever instituted against its insured. The only complaint filed to date, that of the United States and the State of Maine, makes no claim for natural resource damages. Johnson concedes as much, but contends that the duty to defend was triggered by its receipt of administrative notices designating it a PRP.

Here again, courts have come down on both sides of the question. *Compare, e.g., Avondale Industries, Inc. v. Travelers Indem. Co.*, 697 F.Supp. 1314, 1320–23 (S.D. N.Y.1988), *aff'd* 887 F.2d 1200 (2nd Cir. 1989); *Fireman's Fund Ins. Cos. v. Ex-Cell-O. Corp.*, 685 F.Supp. 621, 624–25, 627–28 (E.D.Mich.1987) (administrative notice designating insured a PRP triggers duty to defend) *with, e.g., Detrex Chemical Industries, Inc. v. Employers Ins. of Wausau*, 681 F.Supp. 438, 445–46, 459–60 (N.D. Ohio 1987) (modified on rehearing) (administrative notice insufficient to trigger duty to defend).

■ By focusing on the question whether, damages—as opposed to response costs—are the touchstone of insurance coverage in this context, Maine has aligned itself with those jurisdictions which find no duty to defend until a lawsuit seeking such damages has been filed. *Marois* emphatically held that where "there has been no 'suit against the insured seeking damages,' [ ] the insurer has no present duty to defend." *Marois*, 573 A.2d at 20. There having been no such filing in connection with Johnson's role in the contamination of the McKin Site, no duty to defend has yet been triggered.

#### IV

For the reasons set forth more fully above, I hereby ALLOW the motion for summary judgment filed by the Aetna and DENY the motion filed by Johnson.