CPC INTERNATIONAL, INC., Plaintiff,

v.

NORTHBROOK EXCESS & SURPLUS
INSURANCE CO., Defendant.

Civ. A. No. 89–0211L.

United States District Court,
D. Rhode Island.

March 15, 1991.

See also 739 F.Supp. 710.

food for thought only as the parties have failed to address the matter in their briefs.

David L. Harris, Stephen H. Skoller, Lowenstein Sandler Kohl Fisher & Boylan, Roseland, N.J., Mark O. Denehy, Adler Pollock & Sheehan Inc., Providence, R.I., for plaintiff.

Stephen W. Miller, Clark Ladner Fortenbaugh & Young, Philadelphia, Pa., Brian A. Frankl, Dowd & Dowd Ltd., Charles L. Philbrick, Chicago, Ill., Philip J. McGuire, Gleason McGuire & Shreffler, Chicago, Ill., Kenneth P. Borden, Higgins, Cavanaugh & Cooney, Providence, R.I., for defendant.

## OPINION AND ORDER

LAGUEUX, District Judge.

This matter is before the Court on cross motions for summary judgment brought by both parties, pursuant to Rule 56 of the Federal Rules of Civil Procedure. In addition, defendant Northbrook Excess & Surplus Insurance Company ("Northbrook") has moved to strike the summary judgment motion of its opponent, plaintiff CPC International Inc., ("CPC"), for its failure to comply with Local Rule 12.1 (requiring a statement of undisputed facts).[1]

The crux of the dispute between the parties is whether defendant must pay for response costs related to an environmental clean-up at Peterson/Puritan, Inc., ("Peterson/Puritan"), an aerosol packaging plant located in Cumberland, Rhode Island, and formerly a wholly-owned subsidiary of CPC. CPC is a multinational corporation, involved in the packaging and manufacture of food and grocery products, and specialty chemicals. From July 1, 1979 to July 1, 1980, Northbrook served as CPC's first layer excess insurance carrier, with a $25 million umbrella liability policy.

1. That motion was not pressed at oral argument and, in any event, turns out to be academic. So it will not be addressed in this opinion.

## FACTUAL BACKGROUND

The Puritan Aerosol Company started operations in 1963, packaging household products, such as oven cleaner, hairspray, spot-remover and flea spray. In 1968, the plant was sold to CPC and renamed Peterson/Puritan. The facility, consisting of three connected buildings and a chemical warehouse, lies on a 17 acre site on the Blackstone River in the town of Cumberland, Rhode Island, near the Lincoln town line.

In 1979, both Cumberland and Lincoln discovered chemical contamination in their municipal water supplies. Attempts at clean-up were unsuccessful and the wells were closed later that year. In 1980, the United States Environmental Protection Agency ("EPA") hired environmental engineers Goldberg–Zoino and Associates ("GZA") to conduct a hydrogeologic study of portions of the aquifer underlying the Blackstone River, in order to establish the extent and source of the groundwater pollution. GZA concluded that the most probable source of the contamination of the Lincoln wells was the industrial zone in the northeastern corner of the area, specifically the Peterson/Puritan plant. Because Peterson/Puritan was the only operation in the area known to use and store the particular chemicals found in the water supply (known as VOCs: volatile organic compounds), it became the primary focus of EPA action.

Based on the GZA report, the Town of Lincoln, in October 1982, filed suit against Peterson/Puritan for damages due to the contamination of its water supply. In June of 1984, the suit was settled when Peterson/Puritan agreed to pay the Town of Lincoln $780,000 and to install and maintain engineering controls, in exchange for the Town's release of all potential claims. The claim was paid by Northwestern National Insurance Company ("Northwestern National"), CPC's primary insurance carrier, which had a coverage limit of $1 million.

In 1983, EPA placed the Peterson/Puritan site on its National Priorities List. After several years of negotiations with Peterson/Puritan, in 1987, EPA issued an Administrative Order by Consent, pursuant to the Comprehensive Environmental, Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The Order included a finding that Peterson/Puritan was the party responsible for release of hazardous substances migrating in the groundwater. In response to the Order, Peterson/Puritan undertook a Remedial Investigation/Feasibility Study ("RI/FS") to investigate additional responsible parties and further analyze site conditions.

On April 10, 1987, Northwestern National informed both CPC and Northbrook that the primary insurance policy had been exhausted. On May 1, 1987, CPC agreed to sell Peterson/Puritan to Hi–Port Industries, Inc., a Texas corporation. As part of that agreement, Peterson/Puritan assigned to CPC its rights to claims under any insurance policy for expenses already paid by CPC in connection with the RI/FS.

### A. *The source of the contamination*

To the extent that information is available concerning the source of the contamination, the facts are essentially undisputed by the parties. No scientist or other expert who investigated the Peterson/Puritan facility was able to state unequivocally and precisely what caused the contamination that emanated from the site. But the two hydrogeologic surveys prepared following investigations of the area's aquifer (offered as exhibits by CPC and cited by Northbrook in its "Statement of Undisputed Facts") developed similar theories as to the possible causes of the pollution.

The GZA report, commissioned by the EPA, was aimed at discovering the party responsible for the contamination. As to Peterson/Puritan, that report concluded:

> Inasmuch as GZA did not have complete access to the property during the current study, the specific mechanisms of contaminant entry into the aquifer could not be thoroughly investigated. However, a number of possibilities exist, including direct leakage from floor drains and/or sewer lines within the plant through the unsaturated zone to the water table; runoff of contaminated fluids from the

paved areas of the property; or direct discharge of effluent to Brook A via the aforementioned pipes and subsequent infiltration into the aquifer.

It should be noted that discussion of potential specific contaminant sources within the Peterson–Puritan property or elsewhere in the industrial area must be based partially on speculation. In this context, there is also the possibility of a past incident (e.g. a spill, leak, or discharge of contaminated fluids) representing the source of the aquifer contamination. Peterson–Puritan's original plant was destroyed by fire in 1976, thus no records of any such incident exist. It has been reported that, prior to 1974, the plant employed an on-site disposal system for sanitary waste and discharged process wastewaters to the Blackstone River. Depending on the nature of the discharge and disposal systems, the potential for groundwater contamination may have existed while these systems were in operation.

GZA report, page 40.

The second report was prepared for CPC in 1982 and 1983 by environmental engineers, Malcolm Pirnie, Inc., ("Pirnie report"). In addition to investigating other potential responsible parties in the area, the report was geared to identifying possible sources of contamination within the plant. The Pirnie report concluded:

*The heavy concentration at the plant, contrasted with the broader area of contamination (and the variation of VOC concentrations within this area), tend to support the theory that several distinct events—occurring at different times—and from different sources at the plant, led to the release of VOCs to the ground.* Indeed, the *varying mix* of VOCs found in the monitoring wells indicate that the heavy contamination at the plant may have been due to the more recent release of chemicals separate from the discharges which may have led to the contamination in the more downgradient portions of the aquifer. The multiple source aspect is further supported by the presence of elevated VOC levels at well GZ–2, perhaps due to past

discharges to the brook running along the property. The clustering of sources at the plant, and the fact that contaminants begin to migrate once released to the saturated zone, has made precise identification of responsible sources difficult.

Pirnie report, page VII–13 (original emphasis). Possible sources cited by the report include leakage from the back-yard septic system, the storm water discharge pipe which emptied into the nearby brook, floor drains and associated piping, the vacuum pump flush water, and the fire and explosion at the plant in 1976. Pirnie report, pages VII–7—VII–12.

Beyond the reliance on these two reports, CPC offers no further evidence nor does it advance any other theory as to the source of the contamination. However, Northbrook, during the discovery phase of this suit, deposed several Peterson/Puritan employees. Their testimony about practices at the plant supports the hypotheses of the environmental engineers. The employees described a system of drains on the plant floor used to flush away the chemicals that were frequently leaked or spilled during regular operations. Before 1972 when the plant hooked up to the Blackstone Valley sewer system, these drains led to pipes which emptied into a leaching field behind the plant. Often a remnant or "heel" (less than a full batch) of chemicals would be flushed down the floor drains, if it were a small amount, such as fifty to sixty gallons. Larger amounts would be poured into drums, transported to the leaching field and dumped.

The plant had a storm water system of culverts and roof drains that discharged into the brook on the northern end of site. Around 1975, Frank King, foreman for building and machine maintenance, discovered that process wastewater from the production line, filters and filling machines was being flushed into the storm water system, carrying waste chemicals with it. Mr. King terminated the practice, but estimated that it might have been going on for as long as five years.

Between 1965 and 1975, chemicals were delivered and stored in storage tanks on a concrete pad outside of the plant. Leaks, drips and spills from these tanks were virtually continuous. In 1975 or 1976, over 5,000 gallons of a chemical (perchloroethylene) spilled when a railroad car pulled away while still hooked up to the tank. Chemicals spilled in this manner would go under the concrete or over the edge of the pad into the soil. The floor drains, storm water system and chemical tank farms spills are only a few of the potential pollution sources described by the Peterson/Puritan employees deposed by Northbrook.

Peter Roncetti, manager of regulatory affairs for CPC who was sent in to oversee EPA compliance at Peterson/Puritan, stated when he was deposed, "I believe most likely a number of sources [were responsible for the contamination] rather than a single event. But this is a judgment. There's nothing definitive in those determinations made by ourselves or our consultants." Deposition of Peter Roncetti, page 94. Mr. Roncetti goes on to say that, with the exception of the aforementioned 5,000 gallon spill of perchloroethylene, he has found no indication of any other major spill at the plant (p. 94), and that while the major explosion in 1976 may have caused some spills, it did not appear to result in "any major loss of bulk chemicals from tanks." (p. 96).

B. *The CPC–Northbrook insurance policy*

From July 1, 1979, to July 1, 1980, CPC was insured by Northbrook under an umbrella liability policy numbered 63–005–774. The policy, with a limit of $25 million, was the first layer excess policy, that is, the next coverage in line after Northwestern National's $1 million primary policy. The Northbrook policy insured CPC worldwide, its subsidiaries, and all other entities financially controlled by CPC. Under Section 1, Coverage, the policy states:

The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability

A. imposed upon the Insured by law, or

B. assumed under contract or agreement by the Named Insured,

for damages on account of

A. Personal Injuries

B. Property Damages

C. Advertising Liability,

caused by or arising out of each Occurrence happening anywhere in the world.

The "Definitions" section contains the following relevant explanations.

"Property Damage" shall mean loss of or direct damage to or destruction of tangible property (other than property owned by any Insured) and which results in an Occurrence during the policy period.

"Occurrence" means an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in Personal Injury, Property Damage or Advertising Liability neither expected nor intended from the standpoint of the Insured....

Under the "Exclusions" section of the policy, it provides:

This policy shall not apply

I. to Personal Injury or Property Damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

C. *The complaint*

In its complaint, CPC alleges that all the conditions precedent to insurance coverage have been complied with or waived, and that Northbrook, therefore, is liable for Peterson/Puritan's "entire ultimate net loss," in excess of Northwestern National's coverage limits, including damages arising from both the Town of Lincoln settlement and the EPA-ordered clean-up. CPC seeks

a declaratory judgment from this Court that Northbrook must indemnify it for this amount, as well as a judgment estopping Northbrook from denying coverage, and an award of all costs associated with the litigation.

### DISCUSSION

#### 1. Summary Judgment Standard

Fed.R.Civ.P. 56(c) provides the standard for ruling on a motion for summary judgment:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

A dispute as to some key facts in a case does not necessarily preclude a grant of summary judgment, as long as the facts, and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the party opposing the motion, support judgment for the moving party. *Continental Casualty Co. v. Canadian Universal Insurance Co.*, 924 F.2d 370 (1st Cir.1991).

Section (e) of Rule 56 states:

... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Which is to say that summary judgment is appropriate if the moving party sets out a compelling version of the facts, such as would support a motion for a directed verdict if uncontroverted at trial, and the non-moving party does not respond with any evidence showing a genuine dispute as to those facts. 10A Wright & Miller § 2727.

A similar notion was expressed by the Supreme Court in *Celotex Corp. v. Catrett:*

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The present dispute between CPC and Northbrook may be decided at this point, on the instant motions, by using the methods of summary judgment analysis outlined above.

#### 2. Disputed Issues

Many issues, factual and legal, are disputed between CPC and Northbrook. For example: Was there an "Occurrence," as defined by the policy? Did the "Occurrence" take place during the one-year policy period, July 1979 through July 1980, when CPC was insured by Northbrook? Does payment of response costs pursuant to an EPA order constitute compensable "damages" under the policy? Was the contamination intentional? When was Northbrook notified of CPC's claim in connection with the EPA order? Is Northbrook liable for the settlement with the Town of Lincoln even though the amount paid was within the coverage limits of CPC's primary insurer, Northwestern National?

CPC, the plaintiff in this case, has the burden of proving that it is entitled to insurance coverage under the policy issued by Northbrook. To be compensated under the policy for both claims (the Town of Lincoln claim and the EPA-related claim), all the disputed issues must be decided in CPC's favor. For the purposes of ruling on the defendant's motion for summary judgment, the Court will assume that all

the facts as presented by CPC are true, and draw all reasonable inferences therefrom in CPC's favor. Consequently all the threshold issues posed by the above questions will be resolved in such a way as to bolster CPC's claims for coverage under the insurance policy. However, one insurmountable bar to CPC's prima facie case for coverage remains: the policy's pollution exclusion clause.

### 3. The Pollution Exclusion Clause

Northbrook's policy precludes coverage for property damage "arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants" unless such discharge is "sudden and accidental." This clause is not unique to the policy issued by Northbrook to CPC and has, in fact, been interpreted widely and variously by courts around the country. While New Jersey law governs this case (see this Court's decision at 739 F.Supp. 710), unfortunately, the New Jersey Supreme Court has never interpreted the pollution exclusion clause. However, that state's intermediate courts have issued several decisions on the identical pollution exclusion clause. It is to this line of cases that plaintiff urges the Court to adhere.

### A. *"Sudden and accidental" as interpreted by New Jersey's intermediate courts*

Five New Jersey cases appear to represent the totality of state law on this issue. *Lansco, Inc. v. Dept. of Environ. Protection*, 138 N.J.Super. 275, 350 A.2d 520 (Ch. Div.1975), *affd.* 145 N.J.Super 433, 368 A.2d 363 (A.D.1976), *cert. denied* 73 N.J. 57, 372 A.2d 322 (1977); *Jackson Tp. Mun. Utils. Auth. v. Hartford Accident and Indem. Co.*, 186 N.J.Super. 156, 451 A.2d 990 (L.1982); *CPS Chem. Co., Inc. v. Continental Ins. Co.*, 199 N.J.Super. 558, 489 A.2d 1265 (L.1984), *rev'd. on other grounds*, 203 N.J.Super. 15, 495 A.2d 886 (A.D.1985); *Broadwell Realty Services, Inc. v. Fidelity & Cas. Co. of N.Y.*, 218 N.J.Super. 516, 528 A.2d 76 (A.D.1987); *Summit Assoc., Inc. v. Liberty Mut. Fire Ins. Co.*, 229 N.J.Super. 56, 550 A.2d 1235 (A.D.1988). All five cases involve the identical pollution exclusion clause, which is (or was) standard in the industry.

In *Lansco*, vandals opened valves on two tanks on insured's property, releasing 14,000 gallons of oil into the Hackensack River. The Court found that the pollution exclusion clause did not bar coverage because, although the spill was caused by a deliberate act of a third party, it was "sudden and accidental" as to the insured. 350 A.2d 520. In *Jackson Township*, the Court went further, citing *Lansco* and some decisions from New York's lower courts. In *Jackson Township*, the property damage occurred when pollutants seeped into the aquifer from the insured's landfill. Finding the "sudden and accidental" language ambiguous, the Court interpreted it to favor the insured.

> When viewed in light of the case law cited, the clause can be interpreted as simply a restatement of the definition of "occurrence"—that is, that the policy will cover claims where the injury was "neither expected nor intended." It is a reaffirmation of the principle that coverage will not be provided for intended results of intentional acts but will be provided for the unintended results of an intentional act.

451 A.2d 990, 994.

The *CPS Chemical* Court followed *Jackson Township*. There, the insured generated toxic wastes and contracted for their disposal. Unbeknownst to the insured, the disposal company illegally dumped the toxic wastes on sixteen occasions. Describing the pollution exclusion clause as "poorly drafted," the Court found that it posed no bar to coverage.

In *Broadwell*, pollution was caused by gas leaking from underground tanks. Observing that "the pollution exclusion was intended to be coextensive with the scope of the definition of occurrence," the Court wrote:

> In our view, the pollution exclusion focuses upon the intention, expectation and foresight of the insured. If an insured

knows that liability incurred by a foreseeable polluting event is covered by his policy, he is tempted to diminish his precautions and relax his vigilance.... Where the insured has taken reasonable precautions against contaminating the environment and the dispersal of pollutants is both accidental and unforeseen, we are of the view that the "sudden and accidental" exception to the exclusion is applicable and the loss is thereby covered by the policy.

528 A.2d 76, 86.

Finally, in *Summit Associates*, where the insured discovered a sludge pit on recently-purchased property, the Court determined that the discovery of the pit was an occurrence, neither expected or intended by the insured, and so coverage was not barred by the exclusion clause. 550 A.2d 1235.

### B. *Precedential value of New Jersey intermediate court decisions*

It is well established that this Court, sitting in diversity, must follow the law as announced by the highest court of the state. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). However, decisions of a state's lower courts are less authoritative. The United States Supreme Court enunciated this rule in *Comm'r of Internal Revenue v. Estate of Bosch:*

> Moreover, even in diversity cases this Court has further held that while the decrees of "lower state courts" should be "attributed some weight ... the decision [is] not controlling ..." where the highest court of the State has not spoken on the point. And in *West v. A.T. & T. Co.* [311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940)] this Court further held that "an intermediate appellate state court ... is datum for ascertaining state law which is not to be disregarded by a federal court *unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.*"

387 U.S. 456, 465, 87 S.Ct. 1776, 1782–1783, 18 L.Ed.2d 886 (1967), (cites omitted) (original emphasis). Consequently, in its effort to predict how the highest court of New Jersey would interpret the pollution exclusion clause, this Court must view the five lower court decisions as some evidence toward that end, but must endeavor to see if there is other "persuasive data."

### C. *Guideposts provided by the New Jersey Supreme Court*

Over the years, the New Jersey Supreme Court has applied the following conventional rules of construction when interpreting insurance contracts. When the controlling language is susceptible of more than one interpretation, the interpretation that favors the insured must be applied. *Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, Switzerland*, 35 N.J. 1, 170 A.2d 800 (1961); *Kievit v. Loyal Protective Life Ins. Co.*, 34 N.J. 475, 170 A.2d 22 (1961). However, when the terms of the insurance contract are clear, "it is the function of a court to enforce it as written and not to make a better contract for either of the parties." *Kampf v. Franklin Life Ins. Co.*, 33 N.J. 36, 161 A.2d 717, 720 (1960). Moreover, "effect, if possible, will be given to all parts of the instrument and the construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable." *Prather v. American Motorists Ins. Co.*, 2 N.J. 496, 67 A.2d 135, 138 (1949).

The New Jersey Supreme Court has decided several disputes based on what it determined to be the "reasonable expectations of the parties," even going so far as saying that an insurance contract may be interpreted contrary to its plain meaning in order to fulfill the parties' expectations. *Linden Motor Freight Co., Inc. v. Travelers Ins. Co.*, 40 N.J. 511, 193 A.2d 217, 224 (1963); *Werner Inds., Inc. v. First State Ins. Co.*, 112 N.J. 30, 548 A.2d 188, 191 (1988). However, the Court makes it very clear in these cases that the status of the insured is a key element in ascertaining his "reasonable expectations." For example, in *Werner*, where the Court reversed the Appellate Division's decision in favor of the insured and remanded the case, the Court wrote:

Were this a policy of personal insurance coverage, we might be more inclined to accept the Appellate Division's view as a matter of public policy.... But this is a policy covering commercial risks procured through a broker, and thus involved parties on both sides of the bargaining table who were sophisticated with regard to insurance.

548 A.2d at 192. Likewise, in *DiOrio v. N.J. Mfrs. Ins. Co.*, the Court speaks of "laymen" and "the average policyholder" when explaining the doctrine of reasonable expectations. 79 N.J. 257, 398 A.2d 1274, 1280 (1979). See also *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 495 A.2d 406, 412 (1985).

Most recently, in *Longobardi v. Chubb Ins. Co. of N.J.*, the Court reversed the Appellate Division's ruling that the insured was entitled to coverage despite his misrepresentations to the insurance company. 121 N.J. 530, 582 A.2d 1257 (1990). Acknowledging the rules of construction favoring the insured, the Court went on to say:

> Notwithstanding that premise, the words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability. Although courts should construe insurance policies in favor of the insured, they "should not write for the insured a better policy of insurance than the one purchased."

121 N.J. at 537, 582 A.2d at 1260. Quoting from *Walker Rogge, Inc. v. Chelsea Title and Guar. Co.*, 116 N.J. 517, 529, 562 A.2d 208 (1989).

Bearing in mind these canons of construction, as well as the five lower court decisions on the pollution exclusion clause, this Court will now proceed to analyse how the New Jersey Supreme Court would be expected to interpret the "sudden and accidental" language in question.

### D. *"Sudden and accidental" defined*

█ It is the conclusion of this Court that the New Jersey Supreme Court would refuse to pursue the direction indicated by its lower courts in *Jackson Township* and *Broadwell*. Instead, this writer concludes that the New Jersey Supreme Court, failing to find ambiguity susceptible of more than one interpretation, would follow the plain meaning of the phrase "sudden and accidental" and refuse to "engage in a strained construction to support the imposition of liability." Thus, the exclusion would allow coverage only for events which are "accidental," that is, unexpected and unintended, *and* "sudden," that is, which have occurred abruptly, precipitantly, or over a short period of time. Coverage for gradual pollution would be barred under this pollution exclusion clause, as would coverage for intentional pollution.

This interpretation conforms to the teaching of *Prather*, where the Court indicated that effect should be given to all provisions of the policy and no portion should be left "useless or inexplicable." The lower courts' determination that "sudden and accidental" means "occurrence" renders the language of the exclusion clause superfluous. Additionally, the notion of the "reasonable expectation of the parties" is really not relevant to a dispute such as this between two sophisticated corporations.

The present ruling is not only in keeping with the New Jersey Supreme Court's rules of construction for insurance contracts, but it also finds extensive support from courts across the country who have interpreted the pollution exclusion clause as this Court does today, following what appears to be the emerging nationwide trend.

In *FL Aerospace v. Aetna Casualty and Sur. Co.*, 897 F.2d 214 (6th Cir.1990), plaintiff was ordered by the EPA to participate in the clean-up of an industrial waste site, and sought indemnity from its insurer. The District Court found that the policy's pollution exclusion clause posed no bar, but denied coverage based on plaintiff's failure to notify its insurer of the claim in a timely manner. The Circuit Court affirmed the result, relying exclusively, however, on the view that the pollution exclusion clause did indeed bar coverage. The Circuit Court

applied Michigan law, which was much like New Jersey's. The Michigan Supreme Court had never interpreted the exclusion clause; in fact, it had refused to answer a certified question on the issue the prior year.[2] In addition, in 1986, a Michigan intermediate appellate court had determined that "sudden and accidental" was synonomous with "unexpected and unintended." *Jonesville Products, Inc. v. Transamerica Ins. Group*, 156 Mich.App. 508, 402 N.W.2d 46 (1986), *leave to appeal denied* (1987). The lower court stuck by its interpretation in three subsequent decisions.[3]

The interpretation was, nevertheless, rejected by the Sixth Circuit Court of Appeals:

> We think that the terms "sudden" and "accidental" are not ambiguous and should be given their plain, everyday meaning.... The dictionary definition of "sudden" is "happening, coming, made or done quickly, without warning or unexpectedly; abrupt." The term "accidental" means "happening by chance" or "unintentional" or "fortuitous." These definitions comport with the common understanding of the terms as they are used in everyday parlance. A sudden and accidental event is one that happens quickly, without warning, and fortuitously or unintentionally.

897 F.2d at 219, (cites omitted).

In *Ogden Corporation v. Travelers Indemnity Co.*, 739 F.Supp. 796 (S.D.N.Y. 1989), the District Court for the Southern District of New York predicted that the New York Court of Appeals would include a temporal aspect in its interpretation of the "sudden and accidental" exclusion. The New York Court of Appeals had already ruled that the clause was unambiguous as a matter of law in *Technicon Elec. Corp. v. American Home Assurance Corp.*, where the insured was denied cover-

age for intentional pollution under the "accidental" prong of the exclusion. 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989). In *Ogden*, the insured had operated a scrap processing facility for thirty-three years, which allegedly contaminated the soil on its leased site. The *Ogden* Court held that a ruling that "the release of pollutants over a period of more than thirty years falls within the sudden and accidental exception would render the pollution exclusion clause meaningless." 739 F.Supp. at 800. See also *State of N.Y. v. Amro Realty Corp.*, 697 F.Supp. 99 (N.D.N.Y.1988).

Applying Maine law, the District Court for Massachusetts (Woodlock, J.) denied coverage to an insured who was ordered by state and federal officials to participate in the clean-up of a contaminated waste disposal facility site in Gray, Maine. *A. Johnson & Co. v. Aetna Cas. and Sur. Co.*, 741 F.Supp. 298 (D.Mass.1990). Although the Maine Supreme Judicial Court had not ruled on the pollution exclusion clause, Judge Woodlock relied heavily for direction on the decision in a similar case, *Patrons Oxford Mut. Ins. Co. v. Marois*, 573 A.2d 16 (Me.1990).

> The Supreme Judicial Court of Maine has recently addressed and resolved the substantive issues presented by these motions. Choosing to style its role as "simply to determine the meaning of a private contract between the parties, not to foster or retard environmental goals," the Law Court allied itself with those jurisdictions which have found that the insurer has no duty to indemnify or defend in environmental disputes such as this.

Before turning to the implications of *Marois* for this case, the Law Court's delphic explanation of the role of a court applying Maine law in this context bears some explication. Commentators have

2. Footnote 4 in *Fl Aerospace* explains:
   A panel of this court certified this question to the Michigan Supreme Court in *International Surplus Lines v. Anderson Dev.*, No. 87–2102, on January 26, 1989. The Michigan Supreme Court declined to answer the question on July 10, 1989.

3. See *Polkow v. Citizens Ins. Co. of Am.*, 180 Mich.App. 651, 447 N.W.2d 853 (1989); *Upjohn Co. v. New Hampshire Ins. Co.*, 178 Mich.App. 706, 444 N.W.2d 813 (1989); *Protective Nat'l Ins. Co. v. City of Woodhaven*, No. 101968 (Mich.Ct. App. Sept. 28, 1988) (unpublished), *leave to appeal denied* (1989).

identified as particularly pronounced in the environmental area the fashioning of "judge-made insurance," a trend characterized by "judicial decisions in a number of environmental liability insurance disputes that have created coverage even in the face of contrary policy language."

What appears to have animated the development of judge-made insurance in the environmental area is the desire to spread the very substantial costs of environmental clean-up. This development has had an unintended consequence: the virtual disappearance of environmental liability coverage in part because the potential for broad judicial interpretation has made the scope of the risks for writing such insurance unknown and unknowable. The Law Court's desire "simply to determine the meaning of a private contract" rather than to influence environmental goals appears to reflect a considered judgment not be drawn into an affirmative judicial policy-making role under the rubric of insurance contract interpretation.

741 F.Supp. at 302–303, (cites omitted).

The District Court goes on to interpret the pollution exclusion clause:

> [I]n light of the consciously restrained manner in which the Law Court now approaches the issue of environmental insurance coverage, I am satisfied that, once definitively stated, Maine law on the subject of this old pollution exclusion clause will join the "emerging nationwide judicial consensus that the 'pollution exclusion' clause is unambiguous and that an insured who is accused of causing injury or property damage by the intentional discharge of pollutants over an extended period of time is bound by the terms of the exclusion and is not entitled to be defended or indemnified by its insurer."

741 F.Supp. at 304–305, (cites omitted).

In *Covenant Ins. Co. v. Friday Eng'g, Inc.,* 742 F.Supp. 708 (1990), a suit governed by Massachusetts law, the District Court for Massachusetts (Mazzone, J.) granted insurer's motion for summary judgment after receiving an answer to a certified question posed to the Massachusetts Supreme Judicial Court. See *Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc.,* 407 Mass. 675, 555 N.E.2d 568 (1990). Defendants in *Friday Engineering* were charged with contaminating property through the discharge of toxic solvents into an underground septic system in the regular course of operations over a six-year period. Finding that the pollution exclusion clause barred coverage, the Court wrote:

> In *Lumbermens,* the SJC held that the word "sudden" in this context "must have a temporal aspect to its meaning, and not just the sense of something unexpected." Expanding on this ruling, the *Lumbermens* court stated:
>
> We hold, therefore, that when used in describing a release of pollutants, 'sudden' in conjunction with 'accidental' has a temporal element. The issue is whether the release was sudden. The alternative is that it was gradual. If the release was abrupt and also accidental, there is coverage for an occurrence arising out of the discharge of pollutants.

742 F.Supp. at 710, (cites omitted).

For additional cases supporting this interpretation of the pollution exclusion clause, see *Detrex Chemical Inds., Inc. v. Employers Ins. of Wasau,* 746 F.Supp. 1310 (N.D.Ohio 1990); *Ind. Indem. Ins. Co. v. Crown Auto Dealerships, Inc.,* 731 F.Supp. 1517 (M.D.Fla.1990); *U.S. Fidelity and Guar. Co. v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988) (interpreting Kentucky law); *Fireman's Fund Ins. Companies v. Ex–Cell–O Corp.,* 702 F.Supp. 1317 (E.D.Mich.1988); *Borden, Inc., v. Affiliated FM Ins. Co.,* 682 F.Supp. 927 (S.D.Ohio 1987); *American Motorists Ins. Co. v. General Host Corp.,* 667 F.Supp. 1423 (D.Kan.1987).

## E. *The dispute between CPC and Northbrook*

█ To receive insurance coverage, CPC has the burden of proving that the contamination of the aquifer was caused by events that can be characterized as "sudden and accidental," and thus fit into the exception-

to-the-exception that is the pollution exclusion clause. To survive a motion for summary judgment, CPC must present enough evidence that the polluting events were sudden and accidental to demonstrate that there is a *genuine issue of triable fact* concerning the source of pollution. In the words of the United States Supreme Court, CPC must "make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In its "Statement of Undisputed Facts," CPC has provided no information concerning the source and causes of the contamination. CPC relies exclusively on the reports, submitted as Exhibits A and E, based on two hydrogeological studies conducted in the area. These reports are admittedly speculative, couched in terms of "theories" and "possibilities." The GZA report, commissioned by the EPA, states, while citing a number of possible pollution sources, "It should be noted that discussion of potential specific contaminant sources within the Peterson–Puritan property or elsewhere in the industrial area must be based partially on speculation." GZA report, page 40. The Pirnie report, prepared at the behest of CPC, speaks of indicators that "tend to support the theory" that multiple sources, occurring at different times, led to the contamination. Pirnie report, page VII–13. The report goes on to acknowledge that conditions at the site have "made precise identification of responsible sources difficult." Pirnie report, page VII–13.

What this evidence indicates is that no one really knows exactly what events caused the contamination in the area surrounding the Peterson/Puritan plant, and, further, that CPC would be unable to establish at trial that the contamination was caused by a sudden and accidental event. In fact, what evidence there is (the conclusions of the hydrogeological engineers and the deposition testimony of Peterson/Puritan employees concerning plant practices) indicates that the contamination took place over a period of years and was caused by a combination of leaks, spills and disposal methods—in short, the kind of gradual process that the pollution exclusion clause was designed to exclude.

### 4. Conclusion

The Court finds that CPC has failed to present any concrete evidence concerning an essential element of its case, and so has failed to demonstrate any genuine dispute as to the facts material to this element. Consequently, the Court grants defendant's motion for summary judgment, and plaintiff's motion for summary judgment is hereby denied. The Clerk will enter judgment for defendant forthwith.

*It is so ordered.*